UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE,<br><br>                              Plaintiff,<br><br>  -against-<br><br>MICHAEL A. GOWL, JR., individually; MICHAEL J. WADE, individually; NEW STATE CAPITAL PARTNERS LLC; NS PRC INVESTMENT LLC; PATUXENT R&C ACQUISITION, LLC; PATUXENT INTERMEDIATE LLC; PATUXENT ROOFING & CONTRACTING, LLC d/b/a PAX SERVICES GROUP; LEGACY ACQUISITION FUND, LLC; PRC SELLER HOLDINGS, INC.; PRC SELLER INTERMEDIATE LLC; and COASTAL POOLS, LLC.<br>                              Defendants. | Civil Action No.:<br><br>**1:25-cv-09799**<br><br>**<u>VERIFIED<br>COMPLAINT</u>**<br><br><br>**<u>JURY TRIAL<br>DEMANDED</u>** |

Plaintiff JANE DOE ("Plaintiff"), by and through her attorneys, Joseph & Norinsberg, LLC, as and for her Complaint against MICHAEL A. GOWL, JR. ("Gowl" or "Defendant Gowl"); MICHAEL J. WADE ("Wade" or "Defendant Wade"); NEW STATE CAPITAL PARTNERS LLC ("New State"); NS PRC INVESTMENT LLC ("NS PRC Investment"); PATUXENT R&C ACQUISITION, LLC ("Patuxent Acquisition"); PATUXENT INTERMEDIATE LLC ("Patuxent Intermediate"); PATUXENT ROOFING AND CONTRACTING, LLC d/b/a PAX SERVICES GROUP ("PAX"); LEGACY ACQUISITION FUND, LLC ("Legacy"); PRC SELLER HOLDINGS, INC. ("PRC Seller Holdings"); PRC SELLER INTERMEDIATE LLC ("PRC Seller Intermediate"); and COASTAL POOLS LLC ("Coastal Pools"); (collectively, "Defendants"), alleges upon knowledge as to herself and her own actions, and upon information and belief as to all other matters, as follows:

1

## NATURE OF THE CASE

1.      This case exposes the deviant, predatory, and reprehensible conduct of Mike Gowl—a White male and the Executive Chairman of PAX Services Group—who weaponized his power, wealth, and corporate machinery to exploit, demean, and violate his African subordinate. Gowl engineered, a workplace where misogyny and racism were not aberrations—they were embedded in the business culture Gowl sought to perpetuate. He boasted that he ***"only hires women under thirty with big breasts,"*** instructed Plaintiff to ***"show more cleavage,"*** told her to ***"stop dressing like a Mormon,"*** and used the **N-word** with the same ease, bragging that even his minor child ***"likes a good n*** joke."***

2.      Against that backdrop, Gowl groomed Plaintiff with false promises of advancement if she ***"got close"*** to him, then **drugged and raped her multiple times**, manipulating her into believing it was ***"the alcohol."*** When she resisted and tried to reclaim her boundaries, he retaliated with fury—**isolating her, threatening her life, and firing her under a manufactured pretext.**

3.      Gowl never acted alone. He operated with the tacit approval and/or active participation of PAX, New State Capital Partners, Coastal Pools and his inner circle of executives, who either encouraged, ignored, or helped conceal his misconduct while benefiting from Plaintiff's labor.

4.      This lawsuit seeks to hold all Defendants accountable for the egregious, repeated, and deliberate violations of Plaintiff's civil rights—violations rooted in a culture of power, entitlement, and impunity.

## PRELIMINARY STATEMENT

5.      ***"Just lay there like you're asleep and put the vibrator in."*** *Those words, spoken by **Defendant** Mike **Gowl**, capture the essence of this case. Gowl was not driven by attraction or*

emotion—he was driven by power. He was aroused by domination, by silence, by women rendered passive and defenseless. He hired Plaintiff, twenty years his junior, believing that as her boss, he could use his authority to control, exploit, and discard her at will.

6.      From the start of Plaintiff's employment, he created a toxic work environment rife with misogynistic statements such as ***"I only hire women under thirty with big breasts," "show more cleavage,"*** and ***"stop dressing like a Mormon."*** These were not stray remarks—they were indicative of the comments Gowl freely made, in front of Plaintiff, and male business associates in the anything goes, **"Mad Men"** style, (pre-civil rights act) culture Gowl espoused to recreate.

7.      The only thing that rivaled Gowl's sexism was his racism: Gowl used the N-word freely, bragged that his minor child ***"likes a good n*** joke,"*** intentionally excluded a Black manager from meetings because ***"he is a n***er and he smells…"*** and told Plaintiff her blood had been ***"tainted"*** because her mother had married a ***"dark skinned"*** African.

8.      After hiring Plaintiff, Gowl demanded total submission from Plaintiff. He called it a ***"24/7 mentality,"*** contacting her at times from four in the morning until midnight with corporate tasks, and domestic errands for his then wife and his children.

9.      Gowl repeatedly told Plaintiff that her advancement required ***"getting close"*** to him. Within days of Plaintiff's hire, he was texting her from the hospital where his then wife had just given birth, and his newborn was experiencing complications and in the intensive care unit, probing her religion to test how ***"conservative"*** she was—and how far he could push her boundaries.

10.     Gowl and/or his male inner circle would also willfully and  inappropriately subject Plaintiff to  explicit sexually charged communications—a shirtless video call, a photo of Gowl in his underwear, images of half-naked men, and offensive videos he directed her to watch—

including one depicting women demonstrating how to **"ride"** men, none of which had any legitimate business function and all of which were designed to erode boundaries and assert control.

11.    Within weeks of Plaintiff's hire, the vile comments descended into acts of depravity. Gowl lured Plaintiff to a 9:00 p.m. **"business meeting"** at Nobu, insisted she **"have a drink"** despite her telling him she didn't drink, and when she became disoriented, Gowl, who had bragged to Plaintiff that he **"used to deal Molly,"** took her to his hotel room and tried to forcefully have sex with her until she insisted on leaving and made her way out the room. Raised in a strict, sheltered Muslim home, Gowl weaponized that fact to make Plaintiff blame herself, and believe it was the alcohol. Gowl then exploited Plaintiff's guilt and shame—and did it again.

12.    Weeks later, in Miami, he drugged and raped her, choking her while whispering, **"I don't want you to hate me; I don't want you to be mad."** Later, he bragged, **"choking is my favorite thing,"** and that she was **"quieter and sweeter when half-conscious."**

13.    A few weeks later Gowl FaceTimed Plaintiff late at night and demanded a sexual act. When she resisted, he mocked her—**"so what the f\*\* are we doing then?"**—and then instructed her to **"just lay there like you're asleep and put the vibrator in."** In that moment, he made clear what truly excited him: a woman who was docile, silent, unmoving—an object, not a person—all while his minor child began stirring awake beside him.

14.    Gowl had Plaintiff believing that **"it was the alcohol"** until a work trip to the Bahamas, where he drugged and raped her again. When Plaintiff finally confronted him, and specifically asked if he had drugged her, instead of emphatically denying it, Gowl responded by saying: **"I took my chance because I don't know when I'll be alone with you again"**, never believing for one second that he would ever be held accountable.

15.     After this, Plaintiff kept her distance in part because she was in the final stages of becoming an American Citizen and needed to remain employed. When Gowl's abusive behavior wouldn't stop, she finally refused to meet with him privately, and Gowl swiftly retaliated—removing her from meetings and threatening her life if she ever disclosed anything about what he had done especially to his ex-wife. Gowl then lured Plaintiff to his attorney/enabler's office under the ruse that she was being **"promoted"** only to terminate her and demand that she immediately sign a **"release,"** in exchange for money.

16.     When Plaintiff refused, Gowl unleashed a campaign of harassment and terror that included using a retired FBI agent to illegally **"flash"** his badge and question Plaintiff's friends and family in an effort to intimidate potential witnesses and silence her.

17.     Gowl acted with complete impunity, confident that his power and wealth—and the fraudulent employment scheme he had created—would protect him. From the start, Gowl had deceptively arranged for Plaintiff to be **"hired"** through Coastal Pools, a much smaller company over which he exercised full control through his ownership interest in Legacy Acquisition., rather than through PAX, the multimillion-dollar entity poised for national expansion, where he sat as Executive Chairman.

18.     The plan was simple: use her, abuse her, and if caught, deny she ever worked for PAX or any of the interconnected parent or affiliate entities that controlled her work, which is exactly what he did.

19.     This case is about that plan—a calculated conspiracy of deception, exploitation, and violence carried out by a man who believed his money, titles, and corporate shell game made him untouchable, and the co-defendants who enabled his conduct or turned a blind eye to it. Plaintiff now brings this action to hold Defendants accountable.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

20.    Plaintiff filed a Charge of Discrimination ("Charge") with the United States Equal Employment Opportunity Commission ("EEOC"), against Defendants based on gender discrimination in violation of, *inter alia*, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").

21.    The EEOC issued Plaintiff a "Notice of Right to Sue" on September 25, 2025. Plaintiff has commenced this action within ninety days of receipt of that notice from the EEOC. Upon request by the Court, Plaintiff will provide the EEOC charge number.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under 42 U.S.C. §2000(e), *et seq*. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all claims arising under New York law.

23.    Venue is appropriate in this court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims for relief occurred in this judicial district.

## PARTIES

### *Plaintiff*

24.    At all relevant times, Plaintiff worked for Defendants and was an "employee" entitled to the protections as defined by Title VII, the FLSA, the NYSHRL, and the NYCHRL, and is resident of New York County.

6

*__Defendants__*

25.     Defendant Mike Gowl Jr.  ("Gowl") is an individual who held the title of Chief Executive Officer and later served as Executive Chairman of Patuxent, Roofing and Contracting LLC d/b/a PAX Services Group, and at all relevant times also served as President of Patuxent R&C Acquisition LLC, the parent company of PAX Services Group giving him  authority over PAX's senior leadership—including Mike Wade—its Board members, and direct supervisory control over Plaintiff.

26.     Defendant Mike Wade ("Wade") is an individual who served as Chief Operating Officer of PAX Services Group and was later elevated to Chief Executive Officer, who at all relevant times was in a senior management position with authority over Plaintiff's employment.

27.     Defendant New State Capital Partners LLC ("New State") is organized under the law of Delaware as a foreign limited liability company in New York, with its principal office at 1890 Palmer Avenue, Suite 402, Larchmont, NY 10538.

28.     Defendant NS PRC Investment LLC ("NS PRC Investment") is a Delaware limited liability company with its registered agent, The Corporation Trust Company, located at 1209 Orange Street, Wilmington, DE 19801.

29.     NS PRC Investment LLC is New State Capital Partners' affiliated investment vehicle and owns approximately 52.19% of Patuxent R&C Acquisition LLC.

30.     Defendant Patuxent R&C Acquisition LLC ("Patuxent Acquisition") is a limited liability company organized under the laws of Delaware. It is registered to do business in the District of Columbia, where its registered agent is C T Corporation System, located at 1015 15th St NW, Suite 1000, Washington, DC 20005. Patuxent R&C Acquisition LLC maintains a principal

place of business at 9381 Davis Ave., Laurel, Maryland 20723, and is the parent company of Patuxent Roofing & Contracting LLC d/b/a PAX Services Group.

31.    Defendant Patuxent Intermediate LLC ("Patuxent Intermediate") is a limited liability company organized under the laws of Maryland, with its principal place of business in Laurel, Maryland. It operates as the lending guarantor in the PAX corporate structure.

32.    Defendant Patuxent Roofing and Contracting LLC d/b/a PAX Services Group ("PAX") is a limited liability company organized under the laws of Maryland, with its service of process address located in Plantation, Florida, and its principal place of business located in Laurel, Maryland is a limited liability company organized under the laws of Maryland, with its service of process address located in Plantation, Florida, and its principal place of business located in Laurel, Maryland.

33.    Defendant Legacy Acquisition Fund LLC ("Legacy") is a Maryland limited liability company. At the time Plaintiff was hired, Gowl held a 50% ownership interest in Legacy; as of 2024, he became the 100% owner of Legacy and all its subsidiary entities, including its majority interest in Coastal Pools LLC.

34.    Defendant PRC Seller Holdings, Inc. ("PRC Seller Holdings") is a corporation organized under the laws of Delaware and is part of the seller-side ownership chain holding the remaining 47.81% of Patuxent R&C Acquisition LLC, alongside PRC Seller Intermediate LLC ("PRC Seller Intermediate") and Legacy Acquisition Fund LLC.

35.    Defendant Coastal Pools, LLC is a Maryland limited liability company with a principal place of business in Queenstown, Maryland. At the time Plaintiff was hired, Coastal Pools was 50% owned indirectly through Legacy; as of June 2024, following the transfer of Legacy to Gowl, he became the sole indirect owner of Coastal Pools LLC.

8

36.     Defendant Legacy is part of the seller-side ownership chain that collectively holds 47.81% of Patuxent R&C Acquisition LLC and holds a 66 2/3% interest in Coastal Pools LLC. As detailed further below, Defendants operated as joint employers of Plaintiff because they exercised shared control over the terms and conditions of Plaintiff's employment, including but not limited to hiring, firing, supervision, scheduling, and wage payment.

37.     At all relevant times herein, Defendants jointly employed fifteen or more "employees," including Plaintiff, and are thus collectively constituted "employers" within the meaning of Title VII, the NYSHRL, and the NYCHRL.

## BACKGROUND FACTS

### *Gowl's Reorganization of PAX into a Single Enterprise he Controlled.*

38.     Gowl's rise to power at PAX Services Group began when he took over a Maryland-based commercial roofing company originally founded by Mike Drew—Patuxent Roofing & Contracting, Inc. Once he had control, he didn't simply run the business; he completely rebuilt it in his own image. He reorganized the company into a modern corporate structure by creating Patuxent Roofing & Contracting LLC as the operating company and Patuxent R&C Acquisition LLC as the parent holding entity. That restructuring marked the birth of what is now known as PAX Services Group—a company designed and controlled by Gowl from the top down.

39.     Then, in April 2022, Gowl took the next step to expand his empire. He orchestrated the sale of a 52.19% controlling interest in Patuxent R&C Acquisition LLC to New State Capital Partners LLC, funneled through New State's investment arm, NS PRC Investment LLC. The remaining 47.81% stayed on the seller side—entities that remained squarely within Gowl's control, including PRC Seller Holdings, Inc., PRC Seller Intermediate LLC, and Legacy Acquisition Fund LLC, which he dominated through family trust ownership.

40.     In short, Gowl built PAX, restructured it, and then strategically partnered with private equity—ensuring that while New State held the majority stake, he kept the reins, the influence, and the operational control.

41.     Gowl served as PAX's CEO until January 2024 then he became PAX's Executive Chairman, giving him the authority of a board chair with an active hands-on management role, granting him more power than a CEO. In every way that mattered, Gowl was the decision maker.

42.     In January of 2024, when Gowl elevated to Executive Chairman, Michael Wade, was also elevated from Chief Operating Officer ("COO") to CEO, and was supervised and controlled by Gowl, who admitted as much to Plaintiff during a late-night rant via text stating: ***"Wade has no real power."***

43.     In summary, Gowl ran PAX as both its operating head and New State's embedded partner, reporting directly to New State's executives—including Principal Shaun Vasavada, who oversaw the PAX platform and its strategy to expand nationally.

### *The Coastal Pools–PAX Scheme: A Deliberate Concealment of Liability*

44.     In or around 2022, Gowl acquired a majority ownership interest in Coastal Pools a smaller company legally and operationally separate from PAX—the primary connection between the two entities was Gowl's significant ownership stake in both.

45.     By the time Gowl hired Plaintiff in December 2023**,** he had already engineered a plan to protect himself and PAX and its other affiliated entities, from the consequences of the abuse he intended to commit.

46.     Gowl had found Plaintiff with the assistance of a recruiter for a position he described as 80% executive assistant and 20% personal assistant**.** All performed under his direct supervision and control.

47.    During the initial interview, Gowl offered Plaintiff an annual salary of $130,000.00 plus a 10% bonus of her annual salary, falsely advising that her position was **"exempt"** from overtime pay under the Fair Labor Standards Act. Gowl also told Plaintiff that she would be primarily able to work remotely, which she did. Plaintiff worked from New York City which was her primary residence throughout her employment.

48.    Gowl's job offer reeked of duplicity. He told Plaintiff she would be ***"hired and paid through Coastal Pools,"*** – falsely asserting Coastal Pools was her "employer," but that her job duties would primarily be ***"performing work for both PAX and New State.***"

49.    Of note, Gowl, who would be Plaintiff's **"primary supervisor,"** and whom she would be performing work for, had little if any day-to-day functions at Coastal Pools.

50.    Gowl was not even listed on Coastal Pools website when he hired Plaintiff.

51.    In fact, the only Gowl working full-time at Coastal Pools was Gowl's younger brother Melvin Gowl.

52.    The Coastal Pools payroll scheme was deliberately created to shield Defendants from liability for the very misconduct Gowl knew he intended to commit—and ultimately did commit—against Plaintiff.

53.    On December 12, 2023, Plaintiff accepted Gowl's employment offer and began working the next week, reporting primarily to Gowl, as well as Wade and other senior executives within Defendants' entities

***Gowl Orchestrated a 24/7 Work Schedule Devoid of Professional Boundaries***

54.    From the moment Gowl hired Plaintiff, it became clear that what he had in mind was a role where he would control Plaintiff under the illusion of career advancement, starting with unreasonable demands on Plaintiff's time.

55.     Although Gowl told Plaintiff her job would be ***"80 percent executive support and 20 percent personal tasks,"*** the workload he demanded should have been allocated to at least two full-time employees.

56.     Gowl at times would contact Plaintiff—as early as 4:00 a.m. and at times, as late as midnight, issuing a constant stream of demands that blurred every line between professional and personal. Some were corporate directives; others were domestic chores including running errands, chauffeuring his kids, even babysitting. At times Gowl's request was for Plaintiff to even listen to a random song or video having nothing to do with her job.  Gowl's requests—job-related or not—all served the same purpose, which was to keep her tethered to him at all times. He told her she needed to adopt what he called a ***"24/7 mentality."***

57.     To excuse the intrusion, Gowl hid behind a mantra he repeated like scripture: her success depended on ***"getting close"*** to him. It was the lie he used to disguise exploitation as mentorship and obedience as ambition.

58.     Gowl's grooming began immediately on Christmas Eve 2023, just days after his then wife gave birth to their fifth child. That night the newborn had to be readmitted to the hospital and was in the NICU after experiencing serious health complications. Gowl, while in the hospital, motivated by his desire to get to know Plaintiff texted her, asking her about her religion, despite admitting that, as her boss, *he* was ***"not allowed to ask this,"*** but he did it anyway.



59.    In the following weeks, Gowl pried into every facet of Plaintiff's life. He learned

she had been born in Africa, married young, immigrated to the United States, survived an abusive

marriage in her late teens, and rebuilt herself from nothing. He learned she had put herself through

school, graduating with a 3.8 GPA, that she valued her family and wanted to bring her niece and

nephew over from Africa and adopt them. He catalogued every fact she disclosed about herself, to

leverage later.

60.    Moreover, from those conversations, he learned what every predator looks for—

vulnerability. He learned that Plaintiff was largely alone in America, with no family ties with the

13

exception of her godparents. She had been estranged from her parents since leaving Islam. He learned that Plaintiff had a very small community of friends that she cherished dearly. And professionally, she had an intense drive to succeed. She was exactly what Gowl wanted: hardworking, ambitious, and isolated.

61.     From the beginning, he made it clear that ambition had a price. If Plaintiff wanted to advance, she was to be available to him at all times. Her career prospects were directly tied to her willingness to sacrifice personal boundaries and all of her time.

62.     Whenever Plaintiff showed fatigue or the smallest resistance, Gowl crushed it with a reminder that she needed a **_"24/7 mentality,"_** that advancement required **_"getting close"_** to him, and that the only way to move forward at PAX was through him.

### **_Gowl Boasted about his Racism and Openly Used the N-Word_**

63.     Throughout Plaintiff's tenure Gowl would make it known to Plaintiff that he viewed her as inferior. He mocked her African heritage sneering that her light-skinned African mother—had **_"tainted the family blood"_** by marrying her darker-skinned African father. These comments were not slips of the tongue; they were deliberate acts of humiliation from a man determined to remind Plaintiff that in his world; she was an outsider he could demean at will.

64.     And with that in mind Gowl would casually use the N-word around her. It rolled off his tongue. By way of example, while Plaintiff was chauffeuring Gowl's minor child, he instructed her on what topics to discuss. He told her to **_"ask him about Indians"_**—referring to Native Americans—and then added: **_"he loves a good N***er joke."_**



65.    Another example took place while meeting a few of Gowl's hunting buddies, during a work-related trip, all of whom were Caucasian. While Plaintiff was still within earshot Gowl told his buddies ***"don't worry she's cool** (referring to Plaintiff) **you can say N\*\*er around her."*** When Plaintiff angrily confronted Gowl, he was dismissive and acted as if he had not said anything wrong.

66.    Gowl's racism quite predictably infected his workplace leadership. When Plaintiff questioned why an African American colleague was excluded from key meetings, Gowl responded that he did not invite him because ***"he's a n\*\*\*er** and **he smells weird**"*** and ***"the roofers won't respect him."*** Plaintiff was appalled but no longer surprised.

67.     Because Plaintiff is African, he also made highly inappropriate comments about what he assumed to be Plaintiff's preference for Black men.



68.    Gowl sent texts mocking Plaintiff's heritage by making fun of Muslim People:



69.    Even more deplorable during Plaintiff's tenure, Gowl glorified his racism by sharing stories of random non-whites he had dehumanized and victimized. He confided that he had

once employed a worker of Mexican origin whom he abused until the man obtained citizenship, laughing as he said it. In another instance, he boasted that years earlier he had punched a South-Asian delivery driver on a dare from his friends simply because the man ***"wasn't white."*** And then told Plaintiff that the ***"assholes charged me with a hate crime".***

### *Gowl's Misogynistic Comments Further Deepened the Hostile Work Environment*

70.    Gowl's contempt for women was equally overt. When a female employee at Coastal Pools became pregnant, he sneered to Plaintiff, ***"that's why you don't f\*\*ing hire women,"*** and suggested the employee should be required to work from home during her maternity leave.

71.    On another occasion, when Plaintiff asked Gowl for guidance on a legitimate work-related issue, he seized the moment not to advise her, but to expose his true character—offering a response that revealed his preference for the type of women he wanted in the workplace – …***"women under 30 with big breasts and questionable morals."***



***Gowl Directed a Culture of Deviance***

72.    Gowl did not act alone; he cultivated a circle of enablers who mirrored and magnified his misconduct especially when it came to misogyny.

73.    As part of Plaintiff's unofficial **"job duties,"** and throughout her tenure, Gowl repeatedly subjected Plaintiff to various group texts that were filled with grossly improper and highly offensive messages, including sexual innuendo, sexually charged language, misogyny, racism, xenophobia and even antisemitic sentiments.

74.    For example, in one of the early text chains, Gowl, introduced the individuals on the chain by asking ***"who will be on the flight manifest"*** before texting: ***"Two retards…a tranny***

*and an African American."* The **"African American"** he referred to, was the only African on the chain, his female subordinate—Plaintiff herself.



75.    In another instance, Gowl included Plaintiff on a text chain where he openly and gratuitously mocked transgender people, while offensively comparing different styles of martial arts to *"gays"* and *"straight guys."*



76.    In another instance, Gowl's male business associate George Bonner, while in a work-related group chat, that included Plaintiff, sent a link to what appeared to lead to an article on O.J. Simpson, but the link opened up to a large naked Black man sitting on a bed with his penis hanging off the edge.



77.    The photograph was shocking, pornographic, demeaning, inherently racist given the context and had no conceivable business purpose. But even more shocking, Gowl did not object. And when Plaintiff called to complain to Gowl about how inappropriate the text was, he brushed it off saying it was a joke and ***"it's not that serious."***

78.    In yet another thread, Gowl and his real estate agent Jesus Castanon ("Castanon"), the President and Chief Executive Officer of Real Estate Empire Group, based in Florida, traded

sexually charged jokes. Gowl texted *"can we feed each other chocolate-dipped strawberries"* on

a private flight. Castanon replied with a single word that captured the tone of the group: *"Naked?"*



79.    Another example occurred when Gowl sent a highly inappropriate and demeaning

text, asking Plaintiff to purchase him a *"Cuban speedo."* To ensure she knew exactly what he

meant, Gowl sent a text that contained the image of a man, dripping wet while exiting a pool,

wearing nothing but a speedo.

80.    Then, to further embarrass Plaintiff, Gowl and Castanon, who had also been part of the chain, continued going on about the image and asked Plaintiff for her opinion.

81.    In yet another thread, Gowl chest thumped about *"Alexander the Great"* being a *"badass"* for *"stealing"* the King of Persia's wife, getting *"her pregnant"* and sending her back to him, reducing women to trophies and mere symbols of the male ego and male dominance:



82.     Gowl even volunteered his sentiments about Jewish people, stating that they were a people with ***"no home."***



83.     In no uncertain terms, these text chains that were condoned and many times spearheaded by Gowl, were toxic, vile, highly sexual, clearly inappropriate, and had absolutely nothing to do with work.

84.     When Plaintiff complained to Gowl about these abhorrent messages—because she was justifiably shocked and uncomfortable at being subjected to these texts, especially in a work setting—Gowl told Plaintiff that she was being ***"too serious,"*** and sternly warned her to ***"lighten up."***

85.    Gowl then directed Plaintiff to respond in the group text exchanges, telling her she seemed **"rude"** or **"holier than thou"** when she didn't engage. As he admitted in one message, when looking past his fake reassurances, **"it isn't fun without a reaction…"** making clear he expected her participation regardless of how inappropriate the conversation was.



86.    Gowl made it clear that he wanted Plaintiff to do more than tolerate these exchanges; he wanted her to engage, to further normalize the sexually charged banter and lawless work environment he enjoyed.

87.     The steady stream of Gowl's offensive and deplorable comments reflected the mindset of a man who believed himself beyond accountability. They conveyed a clear message: that within Gowl's orbit, normal workplace rules and basic legal boundaries did not apply. Gowl had cultivated a culture of entitlement and impunity—one where power excused misconduct and those beneath him, namely the Plaintiff, were expected to accept it.

### *Gowl Increasingly and Recklessly Blurred all Personal and Professional Boundaries*

88.     In addition to subjecting Plaintiff to a toxic work environment, he was also aggressive and deliberate in the steps he took to secure physical and emotional access to Plaintiff. From the first week, he began dismantling her boundaries under the guise of mentorship and interest.

89.     Less than seven days into her employment, he was prying into Plaintiff's personal life—her relationships, her values, her past—while at the same time offering up carefully curated glimpses of his own, designed to blur every line between professional and personal.

90.     He confided that he was **"unhappy"** in his marriage and was in the process of filing for divorce.

91.     He said he was ***"looking for someone younger, and more fertile,"*** than the woman who had just given birth to his fifth child, his youngest being barely a month old.

92.     He began texting Plaintiff photographs of women he found attractive, commenting on their looks, and telling her ***"you remind me of my wife when she was young"***—a statement he punctuated with, ***"I shot myself in the foot by hiring you."*** He sent messages about everything from the drinks he was having, to properties he owned and random videos – to keep Plaintiff responding, engaged, and her attention focused on him.

93.     These communications came at all hours—morning, midnight, weekends—whenever his ego demanded an audience. He justified the constant contact by telling her she needed to understand how ***"he thinks"*** and ***"how he conducts business,"*** which he framed as necessary for her professional development.

94.     Gowl also sought to cultivate an image – as a self-proclaimed **"bad boy."** In his desperate attempt to make himself more attractive, young, cool, and hip, Gowl would volunteer details beginning with the steady drum beat of, ***"when I was young...."*** and disclose personal anecdotes that no employer should ever share with a subordinate. Gowl would boast that he had used — and still enjoyed using — illicit drugs such as psilocybin (aka "Mushrooms") (Classified Schedule I controlled substance) Methylenedioxymethamphetamine ("MDMA" aka "Molly"), GHB, and cocaine. Gowl even bragged that he had dealt MDMA in his youth, making clear that he was no stranger to the drug's effects or its power to lower inhibitions.

95.     In doing so, Gowl doubled down on what he wanted Plaintiff to understand. He was the boss, he paid the checks, and he could say or do whatever he pleased—even if it meant flaunting conduct that would get any other employee fired or arrested.

96.     And regardless of the time of day or night, Gowl contacted Plaintiff, by text, phone call, or FaceTime. And because he signed her paychecks, he knew she had no real choice but to answer.

97.      In the 24/7 culture he imposed, her time belonged to him**.** He monopolized it not just to get work done, but to keep her off balance—so she never knew where she ended and he began. That was the essence of his grooming: relentless intrusion dressed up as professional necessity, all in service of his narcissism and self-indulgence.

*Gowl Escalates the Sexual Harassment and Toxic Work Environment by Encouraging a Business Associate to Engage in Similar Improper Conduct*

98.     Less than a month into Plaintiff's employment, Gowl arranged for his real estate agent, Castanon—whom Plaintiff had first encountered in the earlier group text exchanges—to meet her for a walkthrough of Gowl's newly purchased Pinecrest home in Miami. The property Castanon had recently located and closed for him as his realtor.

99.     From the moment Plaintiff arrived, as the tone had already been established in the prior group chats depicted above, Castanon's behavior was openly predatory. He placed his hand on Plaintiff's lower back, and remarked, *"Africans have great genes….."*

100.     As the walk-through continued, Castanon peppered Plaintiff with invasive personal questions, *"why is a pretty girl like you single?"*—and then suggested she meet his assistant. Gowl had already told Plaintiff that Castanon was *"sleeping with his assistant,"* making clear exactly what kind of *"introduction"* he envisioned.

101.     When Plaintiff, visibly uncomfortable and humiliated, tried to step away and wait in the car, Gowl, who had been checking in by phone, stopped her cold, stating: *"Don't leave until Jesus [referring to Castanon] is done and says it's okay."*

102.     Castanon made these inappropriate sexual advances towards Plaintiff, Gowl's executive assistant, with Gowl undoubtedly being one of his largest clients, because he knew Gowl sanctioned it. And in the days before and after meeting Plaintiff at Gowl's Miami home—less than a month into Plaintiff's employment—Castanon had sent Plaintiff texts dripping with false familiarity and entitlement, angling for *"after-hours"* access to make him *"feel special."*

29

103.    And he even suggested that the two of them meet alone:



104.    And texted Plaintiff sophomoric emojis conveying attraction and infatuation:





105.    On yet another occasion, Castanon verbally explored with Plaintiff whether she would be ***"open to having a threesome."***

106.    Indeed, the speed and boldness in which Castanon's conduct towards Plaintiff became illicit and highly inappropriate said everything about the work environment Gowl had created. Within days of their introduction, Castanon, a business associate of Gowl, knew he could proposition Plaintiff, touch her, and treat her like property with impunity.

107.    Indeed, the encounter with Castanon at Gowl's Miami home was a display of dominance, a living embodiment of the toxic fraternity culture Gowl cultivated among his associates—a culture where power insulated misconduct and women existed to be sexualized, not respected, and unfortunately for Plaintiff, Gowl and his cohorts were just getting started.

***Florida Keys Business Trip Gowl Uses to Escalate His Sexual Harassment to Physical Touching***

108.    In mid-January of 2024, not long after the in-person meeting with Castanon, Gowl upped the ante and engineered a private trip. He instructed Plaintiff to drive alone with him to the Florida Keys, claiming he needed her to ***"see his properties that she will be managing."***

109.    Plaintiff later found out that Gowl had already employed a full-time property manager and had no legitimate need for Plaintiff's involvement in managing his properties. The so-called work assignment was merely a cover for isolation, manipulation, to get Plaintiff alone and test the boundaries he wanted to cross.

110.    The trip, which he promised would take a few hours, stretched the entire day. Gowl took Plaintiff around showing her all of his properties, boasting about the millions he had spent on each property, all while studying Plaintiff's reactions and expecting her to gush over his wealth. It was tacky.

111.    During the drive, which alone took several hours, Gowl asked a steady stream of intrusive questions. Plaintiff was typing on her iPad, when he closed it and started asking about anything but work and pending assignments.

112.    Gowl inquired further into deeply personal topics, such as Plaintiff's religion, upbringing, and prior relationships.

113.    Worse, he directly asked about Plaintiff's love life—whether she was dating, what kind of men she liked.

114.    True to form, he again volunteered the kind of women he found attractive, never missing an opportunity to steer the conversation towards his needs, wants and desires.

115.    At one point during the discussion, Gowl even directed Plaintiff to watch the television shows *Mad Men* and *Suits*—both centered on powerful men sleeping with their assistants—claiming it would help her ***"understand what*** [he] ***wanted to achieve"*** with her. When Plaintiff questioned the appropriateness, Gowl insisted it was to ***"learn about*** [him] ***and how*** [he] ***does business."***

116.    Under the pretext of examining a scar on her knee, he reached over and placed his hand on Plaintiff's knee—leaving it until Plaintiff had to physically remove it.

117.    Ultimately, he posed the question he most wanted answered: ***"How long would it take for you to sleep with a man?"*** When Plaintiff was visibly shocked, he tried to downplay the indecency, saying he was ***"just curious"*** because ***"Muslims usually remain virgins."*** Pretending to ***"forget"*** that Plaintiff had been married and to diffuse how highly inappropriate his question was.

118.    When Plaintiff attempted to end the conversation, explaining that she didn't discuss such topics with coworkers, Gowl cut her off and reminded her of the hierarchy: ***"I'm not your coworker. I'm your boss. If you want to move up, you need to be close to me—my friend, my confidant, my right hand."***

119.    Plaintiff reluctantly responded, attempting to make her boundaries clear. She told Gowl that she wanted their relationship to remain strictly professional and that she did not engage in intimacy outside of a long-term commitment. Gowl nodded and filed that answer away—knowing that it was information he would later leverage.

120.     When the two stopped to eat lunch, Gowl unapologetically fixated on her lips and breasts, making her visibly uncomfortable, but he did not seem to care.

121.     After the Keys trip, Gowl began expanding the circle of men who treated Plaintiff as entertainment rather than an employee**.** He next introduced her to his attorney, Douglas S. Walker, Esq., a named partner at the law firm of McAllister, DeTar Showalter & Walker LLC located in Maryland. Of note, Gowl later appointed Walker as a PAX Board Member due to his unconditional **"loyalty."**

122.     Just like Castanon, Walker knew that when it came to Gowl, **"anything goes."** Upon meeting Plaintiff, Walker looked her up and down and said to Gowl, ***"she's hot, man,"*** before turning directly to Plaintiff and adding, ***"damn, nice body,"*** while openly staring at her buttocks.

123.     And true to form, Gowl did not object. He laughed.

124.     Shortly thereafter, Gowl included Plaintiff in a text chain with Walker that descended into crude, homophobic banter—saying he needed to purchase looser fitting jeans to ***"ward off the evil spirits"*** referring to gay men:



125.    The gay-bashing messages in that exchange between PAX's Executive Chairman and a named Partner in a prominent law firm—who again, later served as a PAX Board member under Gowl's leadership—exemplified in the screenshot above, were just additional proof of the culture Gowl enabled—a toxic, juvenile, and lawless environment where professionalism and respect for **"certain groups"** simply did not exist.

126.    It was as if they lived in an alternate universe where civil rights, anti-discrimination workplace laws, and common decency simply did not apply.

***<u>Gowl Intensifies His Harassment of Plaintiff less than a Month into her Tenure</u>***

127.    After the Keys trip, Gowl's behavior also grew even more brazen and erratic as he continued working Plaintiff around the clock, while shamelessly inserting himself into her personal space.

128.    He called her incessantly; Face Timed her at all hours and flooded her phone with texts. Again, Gowl knew full well that, as her boss, she had no real choice but to respond. Her silence or lack of response would mean insubordination.

129.    Unfortunately, Gowl delusionally took her responsiveness as consent for him to accelerate his advances.

130.    In or around mid-January 2024, Gowl unleashed a string of impulsive, self-indulgent communications that had nothing to do with business. Out of nowhere, he sent Plaintiff a selfie to show how his beard was ***"going gray."***

131.    Further, Gowl sent her  a random music video, called to brag about his former **"supposed abs"** and current workout goals, and then followed up with a photo of some random **"progress pic"** of a muscle-bound shirtless male Facebook friend of his, to demonstrate the body he **"hoped"** he could one day have and to also get a sense of Plaintiff's **"type,"** as he had repeatedly done on prior occasions.

132.    Always testing his boundaries, in and around the same time, he conducted a video call with Plaintiff shirtless while laying down in bed:



133.    As if parading his own body to a subordinate were somehow appropriate corporate communication.

134.    In perhaps the most disturbing display of his recklessness and poor judgment, Gowl even sent Plaintiff a shirtless photo of his minor child, referring to it—without irony—as ***"wrestler porn."*** His minor child was on the school wrestling team and Gowl explained that he wanted to show Plaintiff ***"the abs"*** he ***"used to have before middle age."*** The image appeared to have been taken by Gowl himself, who was the only parent present and responsible for his minor child at the time, as his then wife and four other children were away at their primary residence. Most likely, Gowl directed his minor child to flex shirtless for the photo, as the picture clearly depicts the minor hunched slightly forward with his shoulders raised, arms curved inward in a circular position, and fists clenched to accentuate his abdominal muscles. Texting Plaintiff this picture was grotesque in its lack of boundaries, conflating father, boss, and sexual harasser in one narcissistic spectacle using his own child to boost his ego and blur the boundaries. It was beyond unseemly.

135.    And what appeared to be impulsive was, in truth, part of his methodical grooming: to make Plaintiff feel that they were **"close,"** that their relationship had no boundaries.

136.    A few days later, on January 28, 2024, he escalated again—asking Plaintiff outright, ***"would you ever date someone like me?"*** To drive the point home, he dug up and sent a photo of himself in his twenties—coincidentally around the same age as Plaintiff:



137.    The message was unmistakable: Gowl was signaling to Plaintiff that he wanted a sexual relationship with her and was shamelessly exploiting the full access he had to Plaintiff as her boss to convey his desires.

***Defendant Gowl Orchestrates a Private Dinner at Nobu to Set the Stage for Quid Pro Quo Sexual Harassment***

138.    By mid-January 2024—barely four weeks into Plaintiff's employment—Gowl's grooming entered its next phase: he began using the promise of career growth as leverage for personal access. Under the guise of discussing her ***"future with the company,"*** he informed

Plaintiff during a meeting that he wanted to schedule a private **"business meeting,"** to prepare for a meeting with New State that they would both be attending the following day in Upstate New York.

139.    Gowl instructed Plaintiff to schedule this so-called **"business meeting"** for January 30, 2024**,** to coincide with the New State meeting, so he could ensure the pretext of business travel while retaining full control over time and setting.

140.    Gowl dictated every detail. He directed that the business meeting would take place off-site, not at PAX's or New State's office, and not within standard business hours. Gowl scheduled the meeting for 9:00 p.m. at Nobu, a high-end Manhattan restaurant, synonymous with **"date night"** and not business meetings with subordinates.

141.    A few days prior to that meeting he directed Plaintiff to book him a hotel room at Le Meridien, less than a minute's walk from Nobu.

142.    In the days leading up to this so-called meeting, Gowl never once discussed an agenda, deliverables, or business strategy. Instead, he filled their conversations with talk of his failing marriage and his plans to file for divorce. A day or two before Nobu, he even **"joked"** that they could **"sleep in the same bed—separated by pillows."** Plaintiff, visibly uncomfortable, politely told Gowl she had already booked a hotel near Nobu to ensure she would be on time the following morning, but not Le Meridien where Gowl was staying.

143.    On January 30, 2024, Gowl flew in from Washington D.C., met Plaintiff at her hotel, and instructed her to walk with him to Le Meridien so he could **"change"** before dinner and drop off his suitcase. When they arrived, he insisted that she accompany him upstairs rather than wait in the lobby.

144.    As they rode up the elevator, Gowl made sure she noticed his bare left hand—his wedding ring conspicuously **"forgotten"**– pathetically telegraphing that he was **"single"** and available for the night.

145.    Once inside his hotel room, Gowl told Plaintiff to *"come in and sit on the bed"* while he changed. She refused, remaining by the door, tense and uneasy.

146.    Moments later, Gowl removed his pants in front of her. Plaintiff immediately turned away, insisting she could wait outside. Gowl ignored her entirely, told her to stay put, and dismissed her discomfort with a smug, *"I'm done changing."*

147.    Indeed, the entire exchange—from Gowl insisting that Plaintiff come to his room to Gowl undressing in front of her—was an assertion of power and further desensitizing her to extremely inappropriate behavior. Gowl was again signaling to Plaintiff that his authority, his title, and him paying her check, gave him license to do whatever he pleased.

### *The Nobu Dinner and Sexual Assault*

148.    Before arriving at Nobu, Gowl directed Plaintiff to the bar for drinks at Le Meridien hotel while they waited for their reservation. When Plaintiff said she did not drink, he insisted.

149.    When an employee remarked, *"you two are the best-dressed couple"* Gowl smirked and replied, *"thank you,"* dismissing Plaintiff's visible discomfort.

150.    Once seated at the restaurant, Plaintiff opened her laptop to review slides for the meeting with New State that they were going to attend the next day. Gowl became irritated and said, *"put your laptop away. Let's not discuss work,"* stripping away any remaining pretense that the dinner would be professional.

151.    Gowl then steered the conversation entirely to personal topics—Plaintiff's family, her plans to adopt her niece and nephew from her birth country—offering to *"help with any cost this required"* an offer Plaintiff politely declined. Gowl even inquired into Plaintiff's female friends suggesting she *"recruit a few"* of her younger friends to *"hang out"* with his male associates when they go on their boat trips.

152.    At another point Gowl commented about a couple nearby by saying, *"they look like us."* It was clear that he was interested in discussing everything except work. Gowl even inappropriately conveyed his desire for a younger woman who could *"bear him more children."* He likened himself to **"Elon Musk,"** boasting about wanting to keep breeding to build an empire and a legacy.

153.    Plaintiff, growing increasingly uneasy by his conduct, finally confronted him, stating in substance: *"Lines are being crossed or at least blurred. You Face Timed me… shirtless in your bed, you're telling me how unhappy you are in your marriage, you're planning to get divorced and that you want to marry a younger woman…what's going on?"*

154.    A vein popped on Gowl's forehead as he immediately tensed and then angrily responded: *"What do you want? Do you want to just stop talking to me and talk to me 9-to-5? Do you want me to treat you like the foreman or the construction guys? You know what I want … I want to make you a CEO one day of one my companies. I want to make you the head of M&A at PAX so you can learn how to run a business. I want to eventually buy a company and have you run it."*

155.    Seeing Plaintiff's discomfort, he pressed further: *"I want you to be my right hand, my ride-or-die, the one person I can trust."* He reminded her of her privileged access to his bank

accounts and assets, and demanded, ***"tell me again—what do you want? Do you want to stop talking to me and just be treated like a low-level employee and stay a secretary for years?"***

156.    Fearful of losing her job, and more importantly her ***"shot,"*** Plaintiff answered quietly, ***"no problem. I just want to make sure things stay professional."***

157.    As the night wore on, Gowl alternated between using a carrot and a stick to exert control and influence over Plaintiff. At one point he told Plaintiff, ***"look, I'm not sure I'm going to need you at the meeting tomorrow with New State after all. But I'll let you know in the morning,"*** and then at another point offered (laying bare the naked quid pro quo): ***"Look, I can hire a CEO, but I can't train them how to be trustworthy, reliable, honest. I see a leader in you. I can mold you as my protégé…But to achieve this…you need to get close to me…."***

158.    When Plaintiff replied, ***"it sounds like you're looking more for a girlfriend,"*** Gowl snapped: ***"You think I'm Harvey Weinstein? That I'm ugly? That I can't get a girlfriend? I'm choosing you because I like to promote from within."*** He then offered up Wade as an example who started at PAX as a COO but then had recently been promoted to CEO in January of 2024.

159.    Plaintiff later excused herself to go to the restroom, leaving her drink unattended. When she returned and continued drinking, she quickly felt euphoric, dizzy, and disoriented. Plaintiff was not a heavy drinker; in fact, she barely, if ever drank given her very strict Muslim upbringing, so she assumed the alcohol was making her feel this way.

160.    After dinner, Gowl directed Plaintiff to return to the bar for **"a few more drinks,"** claiming he wanted to ***"make sure she understood"*** how he could advance her career. He continued to brag about employees he had ***"groomed"*** into high six-figure positions.

161.    By midnight, Plaintiff could barely stand. Despite this, Gowl leveraged his authority as her supervisor, insisting she accompany him upstairs to get some mail that she needed

to sort through for him and create an action item list, in part for the New State meeting.  Supporting her as she stumbled, he led her to his hotel room.

162.     Once inside, Plaintiff slid down to the floor and sat on the floor beside an ottoman, clearly impaired. Gowl went to the bathroom and then emerged wearing only boxers. When Plaintiff nervously laughed, said, ***"you look funny,"*** he sat on the floor beside her and opened her Instagram page. While going through it with her, he told her, ***"you're a really good dancer. Dancers are good in bed,"*** Gowl then showed her explicit videos of dancers demonstrating how to ride a man.  He then murmured, ***"you'll be mad at me tomorrow."***

163.     Moments later, Plaintiff realized her head was positioned between his legs. Disoriented, she tried to get up. Gowl whispered, ***"relax. I'll order you an Uber—you shouldn't leave like this, you look drunk,"*** massaging her neck with one hand while grasping her face with the other to force a kiss.

164.     Plaintiff broke free, found her way to the bathroom, locked the door, and vomited. When she emerged, Gowl again urged her to stay. Terrified, she demanded to leave. He reluctantly complied but continued stroking her leg as they waited for her Uber.

165.     Gowl walked her to the lobby. Needless to say, the **"mail"** he had used as a pretext to get her alone in his hotel room never surfaced.

166.     Plaintiff cried during the entire Uber ride to the hotel where she was staying, causing the Uber driver to ask what was wrong.

167.     That night, Gowl FaceTimed Plaintiff, apologized for his actions and again dangled promises of promotion.  Plaintiff accepted Gowl's apologies because she felt she had no real choice**.** She was alone in a foreign country, dependent on her job for financial stability, which was even more critical because she had plans to bring up her niece and nephew from Africa and adopt

them. Worse, she knew that unemployment could negatively affect her pending U.S. citizenship application. Gowl controlled her income, her reputation, and her professional future. For Plaintiff, staying on good terms with Gowl wasn't simply about forgiveness—it was about her survival. And she should never have been forced to choose between her dignity and her ability to survive.

168.    The next morning, despite his apologies, Gowl never called or confirmed Plaintiff's attendance at the New State meeting—the very reason he had insisted she stay at a hotel near his, to get an **"early start"** to travel upstate together. In hindsight, the so-called **"business meeting"** that preceded it—one that spiraled into a nightmare—was never about work at all. It was a calculated ruse to isolate Plaintiff and attempt to have sex with her.

***The Pinecrest Assault — Sexual Harassment and Abuse of Power***

169.    In a short span of time Gowl's behavior became even more brazen. He went from positioning his camera so Plaintiff could see him shirtless on FaceTime calls, to sending an unsolicited photo of himself in his boxers, claiming he wanted her to **"see his abs"**:



170.    By February 15, 2024, Defendant Gowl's conduct had devolved into its final, predatory form. That night, he directed Plaintiff to his newly acquired family home in Pinecrest, Florida under the guise of setting up his home office for his ***"arrival the next morning."*** Because the Pinecrest home was newly purchased, Gowl said his home office needed to be set up with Wi-Fi and other equipment so he could prepare for meetings the next morning concerning PAX. He ordered Plaintiff to go to the house that evening to complete the setup, emphasizing that ***"the office has to be ready before morning."***

171.    He added that she could **"stay over in his guest room"** or **"book a nearby hotel if it got too late,"** presenting the illusion of care while ensuring proximity and dependence. Further, as her boss—the man who dictated her schedule, assignments, and future—he knew she could not refuse.

172.    As Plaintiff pulled into the driveway, Gowl called and asked what she wanted for dinner, telling her he was **"minutes away."** The call stunned Plaintiff. Gowl had told her he wouldn't return until the following day. Even more concerning, after leaving his Islamorada property more than two hours away, Gowl waited until he was just minutes from the Pinecrest home, where Plaintiff was going to be working, to call her. The timing was deliberate, giving Plaintiff no opportunity to process the situation, effectively trapping her in a situation she had no chance to avoid.

173.    Still, Plaintiff tried to remain professional and focused on the assignment he had ordered her to complete.

174.    Minutes later, Gowl arrived and began setting a dinner table for two, insisted that Plaintiff **"stay for dinner to celebrate the new home."** Plaintiff was caught in an impossible position—alone in her employer's home, fearful of displeasing the individual who controlled her paycheck and professional future. Against her better judgment, she stayed.

175.    From that moment, Gowl dropped all pretense. He poured a glass of Champagne and insisted that she have a drink; she reluctantly accepted. Within minutes she felt the same overwhelming disorientation she had experienced weeks earlier at Nobu in New York— but this time it was even more intense. In addition to feeling euphoric, her head clouded, her judgment fading similar to the previous time, this time her body immediately felt very heavy. Her limbs felt weighted and difficult to move.  She was unable to think straight.

176.     As they sat on the couch, Gowl grabbed her face and forcibly kissed her. He lifted her onto his lap, violently stripped off her blouse and bra, and bit her breasts hard enough to cause pain. When she exclaimed in pain, *"ow!!!,"* Gowl simply smiled and bit her again. He then grabbed her body and carried her to his bedroom, forcibly removing the rest of her clothing, performed oral sex, digitally penetrated her, and then forced penile penetration while pinning her down and placing his hands around her neck. The entire time Plaintiff felt as though she were in a nightmare, disabled by the drugs that Gowl had put in her drink and unable to physically resist. Gowl choked her as she struggled to breathe, staring at her and whispering, *"I don't want you to hate me. I don't want you to be mad."*

177.     Plaintiff drifted in and out of consciousness, recalling fragments of the night. At one point, she remembered a pillow being pressed over her face while she tried weakly to move it away. When she complained *"you're hurting me!!,"* Gowl ignored her. He was not seeking connection—he was asserting domination.

178.     Gowl engaged in this act of depravity in his marital bed, with his newly born infant's crib just a few feet away.

179.     The next morning, Plaintiff awoke naked in his bed, horrified. When she confronted him, Gowl began to cry and invoked his religion, calling himself a *"devout Catholic"* and a *"family man."* Then, in the ultimate inversion of accountability, he blamed her—saying she had *"gotten drunk"* and *"wanted it"*—and promised to *"forgive her"* and not fire her if she kept quiet.

180.     Gowl sounded so convincing that Plaintiff began to question whether she had gotten drunk despite having only drunk one glass. But when she saw the red marks on her neck, she knew she would have never consented to that, let alone to be intimate with someone that she is not dating who is her own boss. Plaintiff asked Gowl about the choking. Gowl initially denied it but then

confessed that he had done it ***"for his enjoyment,"*** boasting that it made her ***"quieter and sweeter when half-conscious"*** and was ***"his favorite thing to do."***

181.    The toll on Plaintiff after Gowl's sexual assault was catastrophic. She tried to suppress the memories and rationalize what happened, but the fear and trauma compounded daily. She suffered nightmares, trauma, flashbacks, and severe anxiety.

182.    Then she began to experience extreme vaginal pain and discharge.

183.    When she told Gowl, who confessed he had not used protection, he handed her cash and ordered her to get tested for sexually transmitted diseases and pregnancy and to terminate the pregnancy if the test came back positive.

184.    Plaintiff eventually understood the full horror of what Gowl had done: he had sex with her while she was incapacitated, unable to stand, unable to think clearly, and utterly incapable of consenting. There was nothing mutual, nothing voluntary, nothing consensual about what happened. It was an act of domination — planned, executed, and concealed by a man who knew precisely how powerless she was in that moment.

185.    Even under his own account, claiming she was ***"drunk,"*** Gowl knew — as her supervisor and as a grown man—that she could not consent. He knew she couldn't walk. He knew she couldn't speak clearly. He knew she couldn't understand what was happening. And he proceeded anyway.

186.    Then came the most dehumanizing violation: Gowl chose to have unprotected sex without her knowledge or consent, exposing her to sexually transmitted diseases and leaving her terrified she might be pregnant. In the aftermath, Plaintiff was fortunately not pregnant but she was diagnosed with acute vaginosis.

187.    For Plaintiff, the emotional trauma was shattering. She felt violated, robbed of agency, confused, ashamed, and terrified — feelings that Gowl exploited on purpose. He never took responsibility. Instead, he focused on covering his tracks, manipulating her guilt, and reinforcing the lie that she somehow bore responsibility for what he had done.

188.    To this day, Gowl has never apologized for the sexual assault, the physical pain, the emotional devastation. The humiliation of her having to get tested for a venereal disease and an unplanned pregnancy.

189.    After the violent rape at Pinecrest, Gowl exploited the deepest vulnerabilities in Plaintiff's background that he learned from his early probes into her personal life. He knew that Plaintiff had survived an abusive marriage and came from a conservative African culture where women who experience sexual assault are often blamed, shamed, and silenced—where a woman being violated even raped, is treated as her disgrace.

190.    Like a true predator, Gowl understood exactly what that meant for Plaintiff: that disclosure could cost her reputation, her dignity, even her standing within her own community and family. He used that cultural stigma as a weapon, tightening his control and deepening her fear, ensuring that she felt too ashamed and too alone to seek help or expose what he had done. He called incessantly, berating her anytime she did not answer, using his authority as her employer to enforce compliance. He even dictated how she should dress:



191.    Gowl's conduct became so toxic and overbearing that it placed a physical toll on Plaintiff. On March 1, 2024, she collapsed at a café and was rushed by ambulance to the emergency room, where she was diagnosed with stress-related polycythemia and GERD intensified by stress. She left against medical advice, to go back to work.

192.    In around that time Plaintiff began seeing a therapist to manage the severe stress she was experiencing that was wreaking havoc on her both physically and psychologically.

193.     What happened in Pinecrest was not rooted in attraction or consent. It was—an act of predation, sexual violence, perversion and exploitation. Gowl took advantage of Plaintiff's isolation, vulnerability, and the power imbalance inherent in their employer-employee relationship.

194.     Gowl's conduct exemplified what every workplace law seeks to prevent: a man in absolute authority exploiting his position to violate his subordinate's autonomy and then manipulate and exploit her humanity to keep her silent.

***The March 3, 2024, Incident — Escalation of Control and Perversion of Power***

195.     By March 2024, Defendant Gowl continued to engage in obsessive and depraved behavior.

196.     Gowl began texting Plaintiff explicit instructions as he watched her via FaceTime.

197.     When Plaintiff could not fully comply with his demands. She tried to turn him down gently, texting him, ***"I'm not very sexual."***

198.     Rather than respecting her wishes to stop or even feign concern, Gowl said mockingly: ***"So what the fuck are we doing then…"***

199.     He then directed: ***"So you put the vibrator in and lay there like you're taking a nap."***



200.    For Gowl, this was never about intimacy—it was about exploitation, power, dominance and control. Indeed, Gowl's directive ***"to lay there like you're taking a nap"*** revealed what he found arousing.  It mirrored the same perverse pleasure he had already admitted—his preference that she was ***"quieter and sweeter when half-conscious."***

201.    Adding to the perversity, Gowl had carried on this exchange while lying in bed beside his minor child, who was asleep next to him, touching himself and watching her on the video call while instructing plaintiff what to do, and then his minor child woke up.



202.    The image was chilling: a corporate executive, father of five, using his position and his phone to exert sexual power over his subordinate while his own minor child slept inches away, endangering the welfare of his own child who had awakened while Gowl was pleasuring himself. It was not just reckless—it was pathological, evidence of a man whose sense of entitlement had obliterated any trace of decency or restraint. Crossing lines that no parent—and certainly no employer—should ever cross.

*__The PAX Business Trip — Testing Obedience and Escalating Abuse__*

203.    In March 2024, Defendant Mike Gowl once again used his authority to isolate, manipulate, and dominate Plaintiff. He ordered her to attend a Roofers Insurance, Board of Directors Conference where both he and Plaintiff would be representing PAX, the conference took place in Nassau, Bahamas, claiming her attendance was *__"mandatory"__* and *__"essential for her professional growth."__* He told her she would have the opportunity to *__"network"__* and asked her to

55

"*charm potential acquisition targets.*" Before the trip, Gowl tested Plaintiff's obedience and loyalty in a manner both brazen and revealing. He instructed her to bring illegal drugs—**Molly and hallucinogenic Mushrooms**—from his Pinecrest home to the Bahamas. He said it casually, as though asking her to carry office supplies and laughed when she hesitated. He joked that although she was still applying for U.S. citizenship, *"it'd be worse if I got caught—I've got a family,"* completely ignoring and indifferent to the fact she would have been deported.

204.    Plaintiff, terrified and unwilling to break the law and risk her citizenship application, did not retrieve the drugs and bring them on the trip and withheld that information from Gowl in fear of retaliation. As she later discovered, the request was nothing more than a test of submission. Gowl had found another way to bring his drugs to the Bahamas. Indeed, as exemplified in Castanon's text to Plaintiff regarding his Costa Rica trip with Gowl and other business associates explaining how the *"Mushrooms"* would be transported by mail:



205.    Gowl flew Plaintiff to the Bahamas on a private jet, only the two of them were on board, violating his own policy that required at least three passengers or more to justify the cost for a business expense unless there was a major exception.  During the flight, he pressured her to drink, telling her to *"relax"* and *"loosen up,"* even as she tried to keep things professional.

206.    Upon arrival, when Plaintiff said she wanted to rest, Gowl told her that her hotel room *"wasn't ready"* and directed her to wait in his suite instead. Once inside, he offered to give her a *"massage,"* placing his hands on her shoulders until she pulled away and left.

207.    That night, following Gowl's orders, Plaintiff attended what she was told would be

a business dinner with a potential acquisition target and another guest. Despite the fact that detailed calendar invites had been set up on both Gowl's and Plaintiff's PAX calendars, including these individuals, no one else came to the dinner. Gowl didn't even pretend to be surprised and mentioned that the other attendees **"couldn't make it."** Plaintiff then offered to reach out to the individuals to reschedule, Gowl instructed her not to and said that he would do it. Needless to say, Gowl never did.

208.    During the meal, when he realized she had not brought the drugs, he erupted in anger—calling her a **"pussy"** and mocking her fear of being arrested or deported if caught. He sneered, **"you're scared of getting deported."** The tirade was so loud that restaurant staff intervened.

209.    After dinner, the same pattern repeated. Plaintiff began to feel unnaturally heavy and detached.  The sensation was all too familiar—her vision blurred, her muscles slackened, and movement became nearly impossible. What happened next was a near mirror of the prior assaults: Gowl escorted her upstairs, forcibly removed her clothing, penetrated her, and ejaculated on her stomach while she drifted in and out of consciousness.

### *The PAX Trip — Predation and The Moment of Realization*

210.    The next morning, Plaintiff awoke naked in Defendant Gowl's hotel bed. Disoriented and horrified, she confronted him directly—demanding to know whether he had drugged her. At first, he deflected: **"What are you saying? You were just drunk."** And when Plaintiff insisted on answer as to whether he drugged her, instead of a flat denial, Gowl responded by saying: **"I took my chance because I don't know when I'll be alone with you again."**

211.    That admission pierced through the fog. In an instant, Plaintiff's confusion and disbelief gave way to clarity. Gowl's own words stripped away every excuse, every feigned

apology, every illusion of misunderstanding and most importantly every time she had blamed herself believing it was **"the alcohol."** She understood, perhaps for the first time, the full magnitude of what had been done to her —that this was not the act of a man who had lost control or made a mistake, but of a boss who had calculatedly used his power to **drug, dominate and violate** her. His **"chance"** was not a chance at all—it was strategy. And that moment sobered Plaintiff more completely than anything else could have.

212.    For months, Gowl had cloaked his misconduct in the language of mentorship, opportunity, and emotional connection. But his admission made plain that every so-called business trip, every **"business meeting" "every late-night text"** "**every video call**" was part of the same design: to reduce Plaintiff to someone he could control, violate, exploit and then silence.

### *Gowl and Wade's Exploitation of Plaintiff's Cultural and Citizenship Vulnerabilities to further dehumanize and Intimidate her*

213.    Plaintiff did not report the rapes— because she was terrified**.** She understood it would be her word against his—a young immigrant woman confronting a wealthy, well-connected executive who controlled her job, her future, and her reputation. She feared that coming forward would destroy her career and ignite Gowl's anger.   And beyond the fear was the shame and stigma ingrained by her culture, where women who survive sexual assault are too often blamed, disbelieved, or cast out. Paralyzed by fear, humiliation, and the desperate need to protect her livelihood, Plaintiff remained silent—seeing no safe way to come forward that would not risk everything**.**

214.    However, after the PAX **"business trip"** assault, Plaintiff began to distance herself from Defendant Gowl, limiting contact and intending that any future interaction must remain strictly professional. Gowl reacted the way men intoxicated by power often do—by escalating. Deprived of the same level of access, he replaced physical domination with psychological warfare.

215.    Gowl weaponized Plaintiff's immigration status and Muslim heritage, turning one of her greatest fears and deepest vulnerabilities into a tool of humiliation. He would **"joke"** that he might make a **"*fake bomb report"*** in a public place so she would be detained or deported—bragging about it even while they stood in TSA lines. And he was not alone. Early in her tenure, when Plaintiff shared a story about how learning electrical work from her father empowered her as a young girl, Wade interrupted her to sneer, ***"maybe since you grew up Muslim, he was teaching you how to make a bomb."*** These remarks were shocking, reckless acts of bigotry, aimed directly at Plaintiff's lived reality: the fear that even a false accusation could jeopardize her dream of becoming a U.S. citizen.

216.    When Plaintiff finally achieved U.S. citizenship, Gowl made sure to trivialize even that triumph. He texted her, ***"well, no more threats of deportation."***

***Gowl's Unraveling — Violence, Control, and Panic***

217.    On May 12, 2024, despite Gowl's claim of filing for divorce and wanting to find someone ***"younger"*** and ***"more fertile"*** who could bear him more children, his then wife was the one who filed for divorce and served him with papers on Mother's Day.

218.    Fearing that Plaintiff might expose him—as per Gowl, such exposure could cost him ***"millions"*** because of the ***"morality clause"*** in his prenuptial agreement—Gowl resorted to intimidation and threats. Desperate to protect himself in his pending divorce, he acted like an enforcer rather than an executive.

219.    Gowl ordered Plaintiff to destroy evidence of his unlawful conduct, directing her to ***"immediately delete all text messages."*** Plaintiff pushed back, however, telling him essentially that since his wife had filed for divorce, **destroying evidence during litigation was a crime.** Gowl didn't flinch. Instead, he communicated to Plaintiff that his attorney Walker had advised him to

*"delete all text messages"* as well as get rid of his phone—Gowl had replaced his iPhone 10 with

and iPhone 16—essentially boasting that his lawyer, Walker had shown him how to conceal the

evidence. Plaintiff was terrified—and for good reason. Gowl had admitted to acts of violence and

criminal conduct in the past, and he acted as if he was above the law.

### *PAX CEO Mike Wade Engages in Grossly Improper Conduct*

220.    Even in the midst of his divorce, Gowl's exploitation of Plaintiff continued

unabated. In June 2024, he and PAX's CEO Mike Wade arranged what they described as a

**"Salesforce training session"** for Plaintiff—purportedly to show her how to update PAX's M&A

pipeline using the Salesforce platform instead of manually updating a spreadsheet, which was part

of the duties assigned to her by Gowl, Wade, and Vasavada. For that meeting, calendar invites

were sent and reflected on Wade's, Gowl's, and Plaintiff's PAX calendars. But instead of holding

the meeting in any professional or logical setting—a PAX conference room, a Zoom call, or

executive's office—they chose a hotel room. Of note, PAX's system trainings are ordinarily

handled by the IT department. It is highly unusual for senior executives to conduct a basic

Salesforce training session.

221.    The original plan to meet in the hotel lobby was scrapped after Wade claimed it

was *"too loud,"* an excuse that was demonstrably false; the lobby was neither crowded nor noisy.

222.    The notion that the Executive Chairman and CEO of a multimillion-dollar company

positioned for national expansion would conduct a **"training session"** in a private hotel room with

a female subordinate and no witnesses, defies all sense of propriety or professionalism. It was yet

another example of the lawless, boundaryless culture Gowl and Wade fostered and exalted.

223.    Still determined to do her job, Plaintiff did reluctantly comply. However, the pattern was unmistakable: Gowl was once again orchestrating isolation. Terrified, Plaintiff quietly texted her godmother her location before stepping inside.

224.    Once the **"training"** began, the tone eventually turned unprofessional. Wade looked at Plaintiff and said, ***"it's hard to focus with you around."*** Gowl laughed and added, ***"yeah, it's hard to have a sexy assistant around all the time."*** Then, in what was surely a preplanned exit, Gowl stood and said, ***"I've got to leave—you two can finish without me,"*** walking out and leaving Plaintiff alone with Wade.

225.    Once Gowl exited, Wade acted on the permission implicit in Gowl's setup. He flirted, placed his hand on Plaintiff's neck as if to massage her, and slid his hand down her leg. Plaintiff immediately pulled away, fled the room, and confronted Gowl, demanding to know, ***"are you pimping me out?"*** Gowl's subsequent grin said it all.

226.    A few days later, Wade called to **"apologize,"** claiming that he had been trying to make her "***more comfortable.***" The excuse was as insulting as the act itself and emblematic of the culture Gowl had repeatedly subjected Plaintiff to, where sexual harassment and assault masqueraded as mentorship and where Plaintiff's professional success was conditioned on how much humiliation she could endure.

### *M&A Promotion — Plaintiff Earned Her Advancement Through Work for PAX and New State*

227.    Despite Gowl's erratic behavior, violence, threats, manipulation, sexual harassment and assault, Plaintiff excelled at her job and went above and beyond what she was asked to do, hoping that Gowl and or Wade would see her worth professionally and promote her based on her work product.

228.    Unfortunately, Gowl took no meaningful steps to mentor Plaintiff as he had

promised, to eventually promote her to the Head of M&A. He sat on his hands despite acknowledging that Plaintiff *"had the aptitude and drive to build **PAX**'s acquisition division"* and despite also acknowledging that she *"was already performing well beyond her title."*

229.    Indeed, these had been fake promises Gowl weaponized after learning early on that Plaintiff was eager to gain experience in mergers and acquisitions and that she aspired to leadership, perhaps even being a CEO one day.

230.    Unfortunately, instead of mentoring Plaintiff, Gowl would give her **"busy work"** and direct Plaintiff to research acquisition targets for PAX and its private-equity owner, New State. Plaintiff would prepare detailed analyses and present them to Gowl. He would then, without even looking at Plaintiff's work product, respond by telling her to *"keep looking."*

231.    Undeterred, Plaintiff performed M&A work for PAX and New State, by gaining substantial knowledge through experience and self-education. Because Gowl refused to provide any training or mentorship, Plaintiff taught herself—completing online courses, conducting research, and consulting external professionals to fill the knowledge gaps her employer intentionally left open.

232.    Over a couple of months, Plaintiff was instrumental in building up PAX's M&A function from nothing. She created and implemented policies and procedures for the acquisition pipeline, formalizing processes that had never existed. When she started in her role, PAX had no organized data room, workflow, or task delegation system to prevent duplicating work among M&A team members promoting inefficiency. Plaintiff helped draft deal structures, Letters of Intent ("LOIs"), and Indications of Interest ("IOIs"); delegated and tracked tasks; maintained and updated the pipeline; managed data-room access; and coordinated due-diligence efforts with legal, financial, and tax advisors. Her work primarily served and benefited both PAX and New State

alike.

233.    Plaintiff was instrumental in transforming PAX from a disorganized operation into a disciplined, acquisition-ready enterprise. She was critical in helping to create an M&A process that didn't formally exist before, organized over $20 million in EBITDA worth of potential targets, and became the central liaison among sellers, investors, and outside advisors.

### *Gowl Makes Menacing Threat Against Plaintiff to Keep Her Silent*

234.    In or around August 2024, after months of performing executive-level responsibilities—work that went far beyond her title and aligned with the duties of a Head of M&A—Plaintiff prepared and delivered a comprehensive, hour-long presentation to Gowl demonstrating why she had earned the title Head of M&A or, at minimum, M&A Manager.

235.    In or around the same time, Gowl, believing he could leverage Plaintiff's desire to be promoted, showed up at Plaintiff's apartment expressing that he wanted to be with Plaintiff. Indeed, in the months after the last incident of rape, Gowl's manipulation followed a classic pattern of abuse—a relentless cycle of feigned affection, punishment, and control that left Plaintiff emotionally disoriented and exhausted. He would profess feelings for her one moment, only to retaliate and remove her from projects when she rejected him. Over time, Plaintiff recognized the pattern for what it was— a calculated cycle of emotional manipulation and abuse designed to keep her dependent and compliant.

236.    On that day when she rejected him and told him yet again that she just wanted to keep things professional, he became very angry, and it soon became apparent what him professing to have **"feelings"** for Plaintiff was really about. His divorce was still pending and still very much on his mind, and Gowl wanted to ensure Plaintiff kept her mouth shut. When the carrot did not work, Gowl used the stick.  He threatened: ***"If you try to tell my ex-wife, I will burn the house***

down"… **"I will come after you and end your life,"** adding coldly, **"take it as you wish—a threat or not."** He was so riled up he grabbed and jerked Plaintiff's arm to underscore his point. Gowl warned Plaintiff that if she exposed him, he would **"talk to New State executives,"** and said that **"they'll forgive me, but I'll come after you with everything I've got."** He boasted about his connections and invoked Jason Shanks, the Vice President of Operations of Coastal Pools, who had a military background, bragging that Shanks was his **"fixer"** who **"takes care of things."**

### *After Gowl Realizes He Can No Longer Control Plaintiff, He Takes Active Steps to Have Her Terminated*

237.    Shortly thereafter, Gowl set in motion a calculated effort to remove Plaintiff from his orbit and rewrite the record—convinced he could erase every trace of her work for PAX simply by stripping her of her duties and pretending she had been a Coastal Pools employee all along. The hubris was staggering.

238.    When Plaintiff requested the title of M&A Manager to reflect her actual contributions, Gowl utilized this request to offer her a hollow title of **"M&A Coordinator,"** to set his scheme in motion. He informed her she would now handle M&A **"for Coastal Pools only"**— which immediately raised red flags for Plaintiff, as Coastal Pools had no active acquisition pipeline. In or around the same time that Plaintiff was being reassigned to take over Coastal Pool's non-existent M&A department, Defendants started looking for Plaintiff's replacement at PAX.

239.    Plaintiff learned of Defendants' plans because the PAX HR manager informed her—ironically the same week she had been promoted to *M&A Coordinator* —that Gowl and Wade had begun recruiting for a new Executive Assistant ("EA").

240.    When Plaintiff confronted Gowl, he lied, saying the new EA role was **"for Wade."** However, the job description sent to Plaintiff by PAX's HR manager matched Plaintiff's duties exactly and said that the EA will be supporting all executives not just Wade.

241.    Gowl instructed Plaintiff to draft a **"general M&A checklist,"** claiming it was **"in case you ever go on vacation."** and that it needed to be **"very clear so that anyone can use it."** The check list was, in truth, a blueprint for her replacement.

242.    When PAX's HR department contacted Plaintiff to help train the new EA and forwarded the job description, Gowl exploded. He called and texted Plaintiff in a fury, ordering her to **"stop talking to HR."** He again lied and insisted the new hire would **"only work for Wade,"** contradicting the job description and HR's admission that the new EA would support all executives.

243.    Ironically, Gowl telling  Plaintiff this EA would support Wade  and then coordinating  a knowledge-transfer plan to equip the new EA with Plaintiff's internally built M&A process as part of the lead-up to Plaintiff's termination—only serves as further evidence that throughout Plaintiff's tenure,  she had actually been working for PAX and, by extension, New State.

244.    By early August 2024, Gowl's harassment showed no signs of stopping. He would call Plaintiff, demanding that she send him pictures of herself from her four-day vacation—a request she complied with to stay on his good side. She had begun to realize that her attempts to maintain professionalism only seemed to irritate him, and that her **"uptightness,"** as he called it, was prompting him to marginalize her and push her out. Gowl also began interrogating her about whom she spent time with whenever she failed to respond to his calls or texts.

**_Plaintiff Raised Objections to Defendants' Illegal Conduct: Hiring Undocumented Workers and Tax Evasion Schemes_**

245.    As Plaintiff gained more insight into Defendants' operations, she discovered that PAX and Coastal Pools were employing undocumented workers in violation of federal law, a

practice Gowl and Wade personally sanctioned. Further, Plaintiff noticed that Gowl was engaging in tax evasion by filing state taxes in Florida although his primary residence was in Maryland.

246.    When Plaintiff raised the issue, urging Gowl to comply with federal requirements and implement the E-Verify system to confirm employee work authorization, Gowl laughed in her face. ***"If I do that, ninety percent of my workforce will be gone,"*** he said, boasting of the scale of Defendants' violations. Then came the threat: she was to ***"drop it," "never bring it up again,"*** and ***"leave the hiring to us."*** *(referring to his co-Defendants).* Within days, she was stripped of the modest HR duties she had been performing for Defendants to ensure she would have no visibility into their illegal employment scheme.

247.    Plaintiff also discovered that customers were beginning to complain about PAX cutting corners— ignoring safety standards and using unqualified labor. When she tried to alert Gowl, he turned the warning into another quid-pro-quo demand. ***"Stay quiet about that,"*** he told her, ***"if you want more exposure—and a real shot at the head of M&A role I promised."*** Once again, he leveraged career advancement to buy her silence.

248.    Gowl broke immigration laws, labor laws, and ethical standards with the same arrogance he used to violate Plaintiff. He treated the law as a nuisance, employees as disposable, and whistleblowing as betrayal. When Plaintiff tried to hold him accountable, he responded not with reform but with retaliation, removing her authority and threatening her future, for daring her to challenge him. In Gowl's world, accountability was for other people; his wealth and power meant never having to answer for anything.

***<u>After Months of Enduring Illegal Acts of Sexual Harassment and the Prior Sexual Assaults, Plaintiff Made it Clear She Would Not Tolerate Gowl's Conduct</u>***

249.    For months, Plaintiff had endured Gowl's volatile, unpredictable and abusive behavior as well as the extreme toxic and hostile work environment. She had also remained silent

about the prior sexual assaults, primarily because of the shame and guilt she felt as well as the fear of Gowl's retaliation considering the power he wielded. But after confiding in a friend who had witnessed the toll it was taking on her, as well as her therapist, who she had been seeing for several months, Plaintiff finally found clarity and courage, and concluded that she would no longer placate him, or tolerate his abuse.

250.    On or about September 5, 2024, Plaintiff emphatically communicated to Gowl that she *"wasn't his girlfriend"* and that she *"wanted to keep their interactions strictly professional."* That she would no longer tolerate any sexual harassment or unprofessional conduct from him of any kind moving forward, nor would she be willing to go through the humiliation and degradation she had experienced since the beginning of her employment. Meaning, she would **never** meet Wade or Gowl—or anyone from his circle—at hotels, restaurants, or anywhere. She requested to work in the office or take meetings online like every other employee.

251.    Gowl, in response, retaliated immediately and began icing Plaintiff out even before her planned dismissal. On or about September 5, 2024, Gowl ordered Coastal Pool's newly appointed President Vincent Smith ("Smith") to cancel Plaintiff's scheduled onsite meeting—a meeting she had just confirmed with Smith the previous day and had a full agenda for that meeting. And then on September 10, 2024, Smith removed her from future meetings altogether, while also inadvertently admitting what Plaintiff already knew there were no M&A initiatives underway at Coastal Pools:



252.    When Plaintiff asked Smith the real reason he had cancelled **all** of their meetings, even the one he had confirmed, he replied that he was following ***"direct orders from Gowl."***

253.    On or about September 20, 2024, Plaintiff again raised concerns to Gowl about the isolation and retaliation.  She again asked to work in the office, around other employees, and

reiterated her request to end all private lunches, dinners, and one-on-one meetings. Gowl showed

no contrition, nor did he take any accountability. The only emotion Gowl conveyed was contempt.

### ***Defendants Lured Plaintiff to a Fake "Promotion" Meeting to Illegally Terminate Her***

254.    The following Monday, September 23, 2024, Gowl, in true retaliatory fashion,

summoned Plaintiff to a meeting at his attorney Douglas Walker's, law firm, McAllister, DeTar

Showalter & Walker LLC, claiming it was about her promotion. They told her they were ***"creating***

***a new entity, Coastal Acquisition,"*** and that she would ***"run it."*** When Plaintiff said she was sick

from stress and could not attend, Gowl snapped:

> ***"You bitch about having a fake promotion—well I'm creating an
> LLC for you to kickstart the acquisition process. You keep saying I'm
> excluding you from meetings—here's your chance. Don't miss this
> one."***

255.    Plaintiff then sent a text confirming the meeting was to discuss creating an LLC,

Gowl confirmed this in his response:



256.    Of course, Gowl, like on so many other occasions, had deliberately lied to Plaintiff. There was no new LLC for Coastal Pools discussion that day. No promotion. No future. It was a termination meeting, staged to humiliate Plaintiff one final time—with no witnesses except his loyal attorney Walker.  The meeting was intended to make her believe, for a fleeting moment, that she was being elevated, only to have the ground pulled out from under her. It was an act of a sadist, orchestrated by a man who found satisfaction in cruelty because he enjoyed it and believed he would never be held accountable for it.

257.    At the meeting, Gowl and Walker ambushed Plaintiff falsely claiming they had

*"received complaints"* that <u>she</u> was *"unprofessional,"* a fabricated excuse masking the real reason.

258.    During Plaintiff's tenure, Defendants had never issued her a single negative performance evaluation.

259.    During Plaintiff's tenure, Defendants had never placed Plaintiff on Performance Improvement Plan.

260.    During Plaintiff's tenure, Defendants had never taken any disciplinary action against her.

261.    In fact, the only written assessment of Plaintiff performance was drafted by Gowl in April 2024. It was a character reference written to the court to assist in the adoption of her niece and nephew. In it, he praised Plaintiff's character and performance at work when he stated the following:

> *"In her role as an executive assistant,* [Plaintiff] *is consistently exposed to a fast and quickly changing environment in <u>multiple businesses</u>* **(emphasis added)** *...* [Plaintiff] *has consistently demonstrated trustworthiness both in* [her] *personal and professional life. In the workplace, she is known for her integrity, reliability, and honesty.* [Plaintiff] *excels in managing stress and pressure effectively. Whether it's meeting tight deadlines, handling conflicts, or managing high-pressure projects,* [Plaintiff] *maintains a calm and composed demeanor, which positively influences those around them* [sic] *... demonstrate* [sic] *flexibility ... Her dedication to* [her] *work and ability to stay composed under pressure contribute significantly to her job stability.*

262.    That same day, Gowl and Walker presented Plaintiff with a severance agreement that required her to waive all claims against Gowl personally, PAX and all affiliated entities in

exchange for money. The message was unmistakable: sign this, stay silent, and disappear. They pressured her to sign immediately, implying she could not leave until she did.

263.    Plaintiff refused. She told them she would consult an attorney first and walked out.

### *Post-Termination Retaliation — Reckless Intimidation in Plain Sight*

264.    After Plaintiff's termination, Defendants launched a campaign of retaliation that was reckless, arrogant, brazen and illegal.

265.    Within weeks, after refusing to sign the settlement that was offered in exchange for money, Plaintiff learned that several of her friends, neighbors, and even her godparents had been approached by a federal law enforcement official, James T. Lewis ("Lewis"), claiming at first to be a **"federal agent."** In reality, he was a private investigator Defendants had hired. A retired FBI agent who exploited his past credentials to pose as an active one. The credentials he used are depicted below:



266.    In one particularly alarming incident, Lewis arrived in a black SUV with another individual—employing FBI tactics of appearing in twos—at the apartment building of Plaintiff's close friend. Lewis flashed his badge—which he was not authorized to display as a retired FBI agent—and continued mimicking official FBI tactics.  He instructed the doorman not to alert the resident invoking authority he simply did not have as a PI. When Plaintiff's friend cracked open the door—barely clothed, as she was rushing to get to the door in light of the extremely loud banging—she observed the badge that said **"FBI"** that Lewis was illegally flashing. And informed them she needed to get dressed first before letting them into her apartment, believing at that point

they were in fact the FBI.

267.    After Lewis gained entry to her home, he disclosed he was **"retired FBI"** and then quickly pivoted to conducting an interrogation style **"inquiry"** into Plaintiff, asking the friend, if she was ***"aware that*** [Plaintiff] ***had a relationship"*** with her boss, which was a complete fabrication. After the friend denied knowing of any relationship between Plaintiff and her boss – because Plaintiff had never been in a romantic relationship with her boss – Lewis pivoted and seized another opportunity to discredit and defame Plaintiff by spreading the lie that Plaintiff had a history of suing her former employers.

268.    Lewis's lies were calculated to destroy Plaintiff's name, intimidate witnesses and most importantly intimidate Plaintiff. He told friends and neighbors that Plaintiff was a ***"scammer."*** Every word was false. It was Defendants' smear campaign in action—a perverse attempt to make Plaintiff's social circle fear association with her.

269.    The damage was immediate and profound. Plaintiff's friends grew distant. Her godparents—her only family in the United States, and who were especially dear to her after she had become estranged from her biological parents due to her leaving Islam—completely cut off contact with her.

### *Defendants Sabotage Plaintiff's Job Offer*

270.    The intimidation didn't stop at her personal life. Professionally, Defendants went further. After Plaintiff's retaliatory termination, she immediately looked for work and was on the verge of a new beginning—she had been offered a position at a private-equity firm, and had been told the job was hers, subject to a background check:



271.    But suddenly and without warning, the offer was inexplicably revoked. When Plaintiff contacted the recruiter to discern what went wrong, since she had passed the background check, the recruiter informed her that the company had ***"received new information"*** and was ***"no longer moving forward."*** It was clear who was behind it. Defendants, and more specifically, Gowl had made good on his threats—reaching into her future and wrecking it from afar.

272.    Since Plaintiff's retaliatory termination up until the filing of this complaint, she has continued to receive random calls from third party vendors connected with Defendants seeking to know if she is employed as well as her whereabouts. In one instance, shortly after filing her EEOC Charge Plaintiff even missed a call from the cell number belonging to Gowl's minor son.

### *New State and PAX Enabled and Endorsed Gowl's Harassment*

273.    PAX and New State's leadership knowingly enabled and tolerated Gowl's harassment of Plaintiff. During company calls and meetings, Gowl repeatedly sexualized and demeaned Plaintiff—asking, ***"why don't you show more cleavage?"*** and mocking that she ***"dressed like a Mormon."***

274.    These comments were made in the presence of Shaun Vasavada and Mike Wade, senior executives who had the authority to stop Gowl's behavior and should have stopped it.

275.    New State, a sophisticated private-equity firm with a formal corporate culture, knew—or unquestionably should have known—that Gowl's comments were toxic, unlawful, and grossly inconsistent with its own anti-discrimination and anti-harassment policies. Yet instead of condemning this conduct, New State Principal Shaun Vasavada repeatedly laughed at Gowl's remarks and turned a blind eye, signaling tacit approval.

276.    As the 52.19% majority owner of PAX, New State exercised ultimate authority over PAX's leadership, budget, and financing—including strategic direction and performance oversight. New State, through its designated principals, including Shaun Vasavada, routinely reviewed PAX's performance metrics, approved Gowl and Wade's management budgets— and oversaw other executive-level financial decisions—and directly benefited from Plaintiff's work product—all while willfully ignoring obvious, repeated harassment and discrimination occurring during the very weekly calls it participated in.

277.    By failing to act New State and PAX, ratified Gowl's conduct. Their willful inaction made the harassment part of the corporate culture—a tolerated, even protected, aspect of the enterprise.

278.    Given that Gowl had direct supervisory authority over Plaintiff, was the top executive across the entire enterprise—serving as Executive Chairman of PAX, President of its parent company, Patuxent Acquisition, and a majority owner of Coastal Pools—and given that New State, through NS PRC Investment, held a controlling majority stake in Patuxent Acquisition and thus in PAX, it follows that PAX, New State, and Coastal Pools were all strictly liable for Gowl's misconduct.

279.    Likewise, Mike Wade—who served first as Chief Operating Officer and later as Chief Executive Officer of PAX, and who also exercised direct supervisory authority over Plaintiff throughout her employment—renders PAX and New State strictly liable for Wade's unlawful actions.

***Defendants Misclassified Plaintiff and Failed to Pay her Earned Overtime***.

280.    Apart from the foregoing, Defendants further violated Plaintiff's rights by deliberately misclassifying Plaintiff as being exempt from overtime in her initial offer letter.

281.    Throughout Plaintiff's employment, especially early on, Plaintiff engaged in non-exempt administrative level work as well as personal assistant work.

282.    Based on Gowl's mantra of Plaintiff having to develop a 24/7 mentality, Plaintiff was repeatedly expected to work well above forty (40) hours Monday to Friday as well as on the weekends.

283.    Gowl frequently contacted Plaintiff well before 9:00 a.m. and at times, even pre-dawn, and expected her to work late into the night, causing Plaintiff to work twelve (12)-to-sixteen (16)-hour days, during the week and still required to work approximately ten (10) to twenty (20) hours on the weekend.

284.    Throughout this period, when Plaintiff, especially in the months preceding her termination, would complain about not being paid overtime, Gowl would ignore her or imply that Defendants' **"flexible PTO"** policy addressed the compensation owed to her for the overtime hours she worked.

285.    Defendants never paid Plaintiff the required overtime premium—time and a half for all hours worked over forty per week—at any point during her employment.

286.    In doing so, Defendants violated New York Labor Laws and the FLSA by failing to pay Plaintiff her earned overtime for the hours she worked over forty each week.

### *Defendants are Joint-Employers and Joint and Severally Liable*

287.    At all relevant times, Defendants PAX and its related entities, New State and its affiliated investment vehicles, Legacy, and Coastal Pools functioned as a single, integrated enterprise, together with Patuxent Acquisition and its related seller-side entities, including PRC Seller Holdings and PRC Seller Intermediate**,** under the direction and financial control of Defendant Gowl and New State.

288.    Although Plaintiff's paychecks came from Coastal Pools, her actual supervision, duties, and work product were directed by and for PAX and New State. She attended PAX meetings, managed PAX's acquisition pipeline, that was reviewed and approved by New State and prepared materials used directly by New State to evaluate and close deals. Gowl required Plaintiff to sign employment agreements identifying her as a PAX employee, issued her PAX equipment, and gave her a PAX email address and signature block. Internally, she appeared in PAX's directory and externally she was held out to third parties as PAX's **"M&A main point of contact."**

289.    Plaintiff's assignments were driven by New State's executives, including Vasavada, who personally directed her to maintain and update PAX's acquisition pipeline, which

New State reviewed and approved each week. She participated in weekly acquisition calls with Vasavada, Wade, and Gowl, reporting on transactions and strategy far beyond the scope of clerical work.

290.    Though Coastal Pools issued the checks, Plaintiff worked full-time for PAX and New State under New State and Gowl's direction. The arrangement was a corporate fiction designed to obscure Plaintiff's true employer and shield Defendants from liability.

291.    Gowl, Wade, executives of PAX — jointly decided to unlawfully terminate Plaintiff's employment. Their coordinated control over hiring, supervision, and firing further establishes that these entities functioned as joint employers.

292.    Because of this complete overlap in ownership, management, and control—and their shared participation in or tolerance of Gowl's misconduct and/or the financial controls maintained by these entities —Defendants are jointly and severally liable for the discrimination, harassment, and retaliation Plaintiff endured.

293.    Each Defendant exercised authority over Plaintiff's employment, each profited from her labor, and each enabled the abuse that ultimately destroyed her career. They operated not as separate companies but as a single enterprise, united by profit, power, and silence.

294.    As a direct and foreseeable result of Defendants' unlawful conduct, Plaintiff has been formally diagnosed by her treating therapist with Chronic Post-Traumatic Stress Disorder and Severe Major Depressive Disorder, conditions that were directly caused by Defendants' predatory and retaliatory behavior. Plaintiff continues to suffer from weight gain, hair loss, chronic insomnia, anxiety, and persistent emotional distress, all consistent with severe trauma.

295.    Plaintiff's trauma is ongoing and debilitating. She remains under continuous psychiatric and therapeutic care for the first time in her life and has also been prescribed medication

also for the first time in her life to manage anxiety, depression, and insomnia. Despite treatment, she continues to experience flashbacks, nightmares, and panic attacks, often triggered by reminders of Defendants' abuse and the retaliatory campaign that followed. Once confident and ambitious, Plaintiff now struggles with concentration, self-esteem, and trust—her professional trajectory derailed, and her personal life marked by isolation and fear. The emotional, physical, and psychological harm inflicted by Defendants is enduring, and its impact on her career and quality of life cannot be undone. Plaintiff therefore seeks full compensatory and punitive damages to redress the profound and lasting injuries caused by Defendants' conduct.

### FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Gender Discrimination and Hostile Work Environment in Violation of Title VII)*

296.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

297.    Defendants, through their agents Defendant Gowl and Defendant Wade, discriminated against Plaintiff on the basis of her gender, in violation of Title VII, by creating, fostering, condoning, accepting, ratifying, and/or failing to prevent or remedy a hostile work environment that included, among other things, severe or pervasive harassment of Plaintiff based on her gender, and by subjecting Plaintiff to sexual harassment by form of pervasive comments and sexual assault.

298.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

299.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress

and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

300.    Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Quid Pro Quo Sexual Harassment in Violation of Title VII)*

301.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

302.    Defendants—through Executive Chairman Michael A. Gowl, Jr.—conditioned concrete job benefits and the avoidance of adverse actions on Plaintiff's submission to unwelcome sexual conduct, in violation of Title VII. Gowl repeatedly tied promotions, compensation, and advancement to *"getting close"* to him personally and privately, promising that he would make Plaintiff *"Head of M&A," "run a company,"* or even become a *"CEO,"* while insisting on late-night, off-site *"career"* meetings and travel that were pretexts for sexual access. When Plaintiff sought to maintain professional boundaries or later refused any further private meetings, Defendants removed her duties, excluded her from meetings, recruited her replacement, canceled her scheduled on-sites, and then orchestrated a termination meeting at PAX's Board Member's law office under a false *"promotion"* pretense accompanied by a demand for a release to silence her. These are tangible employment actions within the meaning of Title VII.

303.    Illustrative episodes include, but are not limited to, the following incidents: (a) the January 30, 2024 **"business meeting"** at Nobu in New York City, where Gowl told Plaintiff to put away her laptop, proposed titles (Head of M&A/CEO), and made clear that advancement required becoming his *"right hand"* and *"getting close,"* followed by sexual misconduct in his hotel room

that night; and (b) the March 2024 PAX Business trip, billed as **"mandatory"** for her growth, culminating in a drugging and rape in his hotel suite.

304.    Plaintiff reasonably understood—and Defendant Gowl deliberately intended to create this impression —that acquiescence would yield promotions, raises, and prestige (e.g., inclusion in New State meetings, M&A authority, public-facing titles), while refusal or withdrawal of access would result and did in loss of duties, exclusion from meetings, cancellation of opportunities, and ultimately her wrongful termination. The causal link materialized when, after Plaintiff made clear in early September 2024 that interactions must remain strictly professional and in-office only, Defendants immediately removed her from meetings, progressed the replacement hire, canceled her site visit, and terminated her days later at PAX's Board Member law office under a false **"new entity"** ruse.

305.    At all relevant times, Gowl PAX's Executive Chairman served as Plaintiff's direct supervisor, and had immediate or successively higher authority over Plaintiff, making Defendants strictly liable or his conduct. As a direct and proximate result of Defendants' quid pro quo sexual harassment, Plaintiff suffered and continues to suffer lost wages and benefits; loss of career opportunities; reputational harm; and severe emotional distress. Plaintiff seeks all legal and equitable relief available, including back pay, front pay, compensatory and punitive damages, attorneys' fees, and costs.

## THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Retaliation in Violation of Title VII)*

306.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

307.    Title VII prohibits employers from retaliating against employees who engage in activity protected by Title VII.

308.    As set forth above, Defendants, through their agent Defendant Gowl, retaliated against Plaintiff by altering her work conditions, stripping her of meaningful duties, and ultimately terminating her because Plaintiff complained about Defendant Gowl's sexual harassment and rejected his sexual advances.

309.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered economic loss, and continues to suffer, for which she is entitled to an award of monetary damages.

310.    As a direct and proximate result of Defendants' retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

311.    Defendants' unlawful retaliatory actions constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Racial Discrimination in Violation of 1981and Hostile Work Environment)*

312.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

313.    Defendants, through their agents Defendant Gowl, discriminated against Plaintiff on the basis of her race, in violation of 1981, by creating, fostering, condoning, accepting, ratifying, and/or failing to prevent or remedy a hostile work environment that included, among other things, severe or pervasive harassment of Plaintiff based on her race and African and Muslim heritage, and by subjecting Plaintiff to  repeated use of the N-Word, describing her as having tainted blood because her mother married a dark skinned African and other racist  and pervasive comments.

314.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of 1981, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

315.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

316.    Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of 1981, for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Hostile Work Environment Sexual Harassment and Discrimination in Violation of the NYSHRL)*

317.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

318.    The NYSHRL prohibits discrimination in the terms, conditions, and privileges of employment based on an individual's sex and/or gender.

319.    Defendants, through their agents Defendant Gowl and Defendant Wade, as described above, discriminated against Plaintiff in violation of the NYSHRL by subjecting Plaintiff to a hostile work environment in the form of highly inappropriate and improper sexual remarks, unwanted sexual propositions, and sexual assault.

320.    As a direct and proximate result of Defendants' conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety,

loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

321.    At all relevant times, Defendants Gowl as PAX Executive Chairman and Defendant Wade as PAX CEO, had immediate or successively higher authority over Plaintiff. Defendants are therefore vicariously liable for sexual harassment and hostile work environment; under the NYSHRL, employer liability is strict for supervisor harassment.

322.    Defendants are therefore vicariously liable for sexual harassment and Hostile Work Environment; under the NYSHRL.

## SIXTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Quid Pro Quo Sexual harassment under NYSHRL)*

323.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

324.    Defendants—through Executive Chairman Gowl.—conditioned concrete job benefits and the avoidance of adverse actions on Plaintiff's submission to unwelcome sexual conduct, in violation of NYSHRL.

325.    Gowl repeatedly tied promotions, compensation, and advancement to ***"getting close"*** to him personally and privately, promising that he would make Plaintiff ***"Head of M&A,"*** ***"run a company,"*** or even become a ***"CEO,"*** while insisting on late-night, off-site **"career"** meetings and travel that were pretexts for sexual access. When Plaintiff sought to maintain professional boundaries or later refused any further private meetings, Defendants removed her duties, excluded her from meetings, recruited her replacement, canceled her scheduled on-sites, and then orchestrated a termination meeting at PAX's Board Member law office under a false **"promotion"** pretense accompanied by a demand for a release. These are tangible employment actions within the meaning of NYSHRL.

326.    Illustrative episodes include, but are not limited to, the following incidents: (a) the January 30, 2024 **"business meeting"** at Nobu in New York City, where Gowl told Plaintiff to put away her laptop, proposed titles (Head of M&A/CEO), and made clear that advancement required becoming his ***"right hand"*** and ***"getting close,"*** followed by sexual misconduct in his hotel room that night; (b) and the March 2024 PAX's business trip, billed as **"mandatory"** for her growth, culminating in a drugging and rape in his hotel suite.

327.    Plaintiff reasonably understood—and Defendant Gowl deliberately intended to create the impression —that acquiescence would yield promotions, raises, and prestige (e.g., inclusion in New State meetings, M&A authority, public-facing titles), while refusal or withdrawal of access would result and did in loss of duties, exclusion from meetings, cancellation of opportunities, and ultimately her termination. The causal link materialized when, after Plaintiff made clear in early September 2024 that interactions must remain strictly professional and in-office only, Defendants immediately removed her from meetings, progressed the replacement hire, canceled her site visit, and terminated her days later at PAX's Board Member's office under a false **"new entity"** ruse.

328.    At all relevant times, Gowl (Executive Chairman and President) and Wade (CEO) had immediate or successively higher authority over Plaintiff. Defendants knew of Defendant Growl's harassment. Vasavada witnessed Gowl on weekly calls making sexually inappropriate remarks to Plaintiff and either laughed or took no action.

329.    As a direct and proximate result of Defendants' quid pro quo sexual harassment, Plaintiff suffered and continues to suffer lost wages and benefits; loss of career opportunities; reputational harm; and severe emotional distress. Plaintiff seeks all legal and equitable relief

available, including back pay, front pay, compensatory and punitive damages, attorneys' fees, and costs.

330.    At all relevant times, Gowl (Executive Chairman and President) and Wade (CEO) had immediate or successively higher authority over Plaintiff. Defendants are therefore vicariously liable for quid pro quo harassment; under the NYSHRL, employer liability is strict for supervisor harassment.

331.    Defendants are therefore vicariously liable for quid pro quo harassment; under the NYSHRL and employer liability is strict for supervisor harassment.

### SEVENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Hostile Work Environment Sexual Harassment Under NYCHRL)*

332.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

333.    The NYCHRL prohibits discrimination in the terms, conditions, and privileges of employment based on an individual's sex and/or gender.

334.    Defendants, through their agents Defendant Gowl and Defendant Wade, as described above, discriminated against Plaintiff in violation of the NYCHRL by subjecting Plaintiff to a hostile work environment in the form of highly inappropriate and improper sexual remarks, unwanted sexual propositions, and sexual assault.

335.    As a direct and proximate result of Defendants' conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

336.    At all relevant times, Defendant Gowl PAX Executive Chairman, President and Wade PAX (CEO) had immediate or successively higher authority over Plaintiff. Defendants are therefore vicariously liable for sexual harassment and hostile work environment; under the NYCHRL, employer liability is strict for supervisor harassment.

## EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### (*Quid Pro Quo Sexual Harassment Under NYCHRL*)

337.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

338.    Defendants—through Executive Chairman Gowl—conditioned concrete job benefits and the avoidance of adverse actions on Plaintiff's submission to unwelcome sexual conduct, in violation of NYCHRL.

339.    Gowl repeatedly tied promotions, compensation, and advancement to ***"getting close"*** to him personally and privately, promising that he would make Plaintiff ***"Head of M&A,"*** ***"run a company,"*** or even become a ***"CEO,"*** while insisting on late-night, off-site **"career"** meetings and travel that were pretexts for sexual access. When Plaintiff sought to maintain professional boundaries or later refused any further private meetings, Defendants removed her duties, excluded her from meetings, recruited her replacement, canceled her scheduled on-sites, and then orchestrated a termination meeting at counsel's office under a false **"promotion"** pretense accompanied by a demand for a release. These are tangible employment actions within the meaning of NYCHRL

340.    Illustrative episodes include, but are not limited to, the following incidents: (a) the January 30, 2024 **"business meeting"** at Nobu in New York City, where Gowl told Plaintiff to put away her laptop, proposed titles (Head of M&A/CEO), and made clear that advancement required becoming his ***"right hand"*** and ***"getting close,"*** followed by sexual misconduct in his hotel room

that night; (b) and the March 2024 PAX's business trip, billed as **"mandatory"** for her growth, culminating in a drugging and rape in his hotel suite.

341.    Plaintiff reasonably understood—and Defendant Gowl deliberately intended to create this impression —that acquiescence would yield promotions, raises, and prestige (e.g., inclusion in New State meetings, M&A authority, public-facing titles), while refusal or withdrawal of access would result and did in loss of duties, exclusion from meetings, cancellation of opportunities, and ultimately her termination. The causal link materialized when, after Plaintiff made clear in early September 2024 that interactions must remain strictly professional and in-office only, Defendants immediately removed her from meetings, progressed the replacement hire, canceled her site visit, and terminated her days later at PAX's Board Member's office under a false **"new entity"** ruse.

342.    At all relevant times, Gowl (Executive Chairman and President) and Wade (CEO) had immediate or successively higher authority over Plaintiff. Defendants knew of Defendant Growl's Harassment. Vasavada witnessed Gowl on weekly calls making sexually inappropriate remarks to Plaintiff and either laughed or took no action.

343.    As a direct and proximate result of Defendants' quid pro quo sexual harassment, Plaintiff suffered and continues to suffer lost wages and benefits; loss of career opportunities; reputational harm; and severe emotional distress. Plaintiff seeks all legal and equitable relief available, including back pay, front pay, compensatory and punitive damages, attorneys' fees, and costs.

344.    At all relevant times, Gowl (Executive Chairman and President) and Wade (CEO) had immediate or successively higher authority over Plaintiff. Defendants are therefore vicariously

liable for quid pro quo harassment; under the NYCHRL, employer liability is strict for supervisor harassment.

345.    Defendants are therefore vicariously liable for quid pro quo harassment; under the NYCHRL and employer liability is strict for supervisor harassment.

## NINTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Retaliation in Violation of the NYSHRL)*

346.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

347.    The NYSHRL prohibits employers from retaliating against employees who engage in activity protected by the NYSHRL.

348.    As set forth above, Defendants, through their agents Defendant Gowl and Defendant Wade, retaliated against Plaintiff by altering her work conditions, stripping her of meaningful duties, and ultimately terminating her because Plaintiff complained about Defendant Gowl's sexual harassment and rejected his sexual advances and abuse.

349.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered economic loss, and continues to suffer, for which she is entitled to an award of monetary damages.

350.    As a direct and proximate result of Defendants' conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

## TENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Retaliation in Violation of the NYCHRL)*

351.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

352.    The NYCHRL prohibits employers from retaliating against employees who engage in activity protected by the NYCHRL.

353.    As set forth above, Defendants, through their agents Defendant Gowl and Defendant Wade, retaliated against Plaintiff by altering her work conditions, stripping her of meaningful duties, and ultimately terminating her because Plaintiff complained about Defendant Wade and Defendant Gowl's sexual harassment and rejected his sexual advances.

354.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered economic loss, and continues to suffer, for which she is entitled to an award of monetary damages.

355.    As a direct and proximate result of Defendants' conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

## ELEVENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Sexual Assault)*

356.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

357.    On multiple occasions in 2024, Defendants Gowl and Wade intentionally placed Plaintiff in apprehension of imminent harmful and offensive contact of a sexual nature. These

episodes include, without limitation: (a) January 30, 2024 (New York City)—after a late-night **"business meeting"** dinner at Nobu at which Gowl tied promotions and prestige to ***"getting close,"*** he insisted that Plaintiff accompany him to a private hotel room under the pretense of discussing her elevation to ***"Head of M&A"/"CEO,"*** creating an immediate and reasonable apprehension of imminent unwanted sexual contact; (b) March 2024 PAX's Business trip—a **"mandatory"** business trip arranged by Gowl under the guise of professional development that culminated in private encounters in his suite, again preceded by statements linking her advancement to personal access; and (c) June 2024 —a purported **"Salesforce training"** set by Wade in a hotel room after Gowl remarked it was ***"hard to have a sexy assistant around,"*** where Wade made sexual advances toward Plaintiff, creating a reasonable and immediate apprehension of unwanted sexual contact.

358.    Defendants' conduct was without Plaintiff's consent and was intended to cause—and did cause—Plaintiff to fear imminent unwanted sexual contact.

359.    As a direct and proximate result of Defendants' sexual assault, Plaintiff suffered severe emotional distress, anxiety, humiliation, loss of dignity, and related damages, including physical manifestations of stress.

360.    Defendants' actions were willful, wanton, malicious, and oppressive, warranting an award of punitive damages in addition to compensatory damages.

### TWELFTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Sexual Battery)*

361.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

362.    On multiple occasions in 2024, Defendants Gowl and Wade intentionally placed Plaintiff in apprehension of imminent harmful and offensive contact of a sexual nature. These

episodes include, without limitation: (a) January 30, 2024 (New York City)—after a late-night **"business meeting"** dinner at Nobu at which Gowl tied promotions and prestige to ***"getting close,"*** he insisted that Plaintiff accompany him to a private hotel room under the pretense of discussing her elevation to ***"Head of M&A"/"CEO,"*** creating an immediate and reasonable apprehension of imminent unwanted sexual contact; (b) March 2024 (PAX's Business trip—a **"mandatory"** business trip arranged by Gowl under the guise of professional development that culminated in private encounters in his suite, again preceded by statements linking her advancement to personal access; and (c) June 2024 —a purported **"Salesforce training"** set by Wade in a hotel room after Gowl remarked it was ***"hard to have a sexy assistant around,"*** where Wade advanced on Plaintiff, creating a reasonable and immediate apprehension of unwanted sexual contact.

363.    Defendants' conduct was without Plaintiff's consent and was intended to cause— and did cause—Plaintiff to fear imminent unwanted sexual contact.

364.    As a direct and proximate result of Defendants' sexual assault, Plaintiff suffered severe emotional distress, anxiety, humiliation, loss of dignity, and related damages, including physical manifestations of stress.

365.    Defendants' actions were willful, wanton, malicious, and oppressive, warranting an award of punitive damages in addition to compensatory damages.

### THIRTEENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Racial Discrimination & Hostile Work Environment — NYSHRL)*

366.    Plaintiff is a member of protected classes on the basis of race and color.

367.    Defendants subjected Plaintiff to unwelcome conduct because of her race and/or color, including but not limited to disparate treatment, derogatory comments, and differential terms and conditions of employment.

368.    The conduct was more than petty slights or trivial inconveniences and, under the NYSHRL as amended, unlawfully altered the terms and conditions of Plaintiff's employment.

369.    Defendants are liable for the discriminatory and harassing conduct of their employees and/or agents under respondeat superior and direct liability principles.

370.    As a direct and proximate result, Plaintiff suffered damages, including emotional distress, reputational harm, and economic losses.

371.    Plaintiff demands all relief available under the NYSHRL, including compensatory damages, punitive damages where available, reasonable attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

## FOURTEENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Race Discrimination & Hostile Work Environment – NYCHRL)*

372.    Plaintiff is a member of protected classes on the basis of race and color.

373.    Defendants, through their employees and agents, treated Plaintiff less well than other employees, at least in part because of her race and/or color, including by subjecting her to a racially hostile work environment.

374.    The discriminatory and harassing conduct was more than a petty slight or trivial inconvenience.

375.    Defendants are strictly and/or vicariously liable under the NYCHRL for discriminatory acts of managers and agents, and otherwise liable for failing to prevent or correct the harassment.

376.    As a result, Plaintiff has sustained damages, including emotional distress, reputational harm, and economic losses.

377.    Plaintiff seeks all remedies available under the NYCHRL, including compensatory and punitive damages, attorneys' fees, costs, and any appropriate equitable relief.

95

### FIFTEENTH CLAIM FOR RELIEF AGAINST DEFENDANT MICHAEL GOWL
(*Gender-motivated Violence Under The New York City Administrative Code*)
(N.Y.C. Admin. Code §§ 10-1101 et seq.)

378.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

379.    The New York City Victims of Gender-Motivated Violence Protection Act ("GMVA"), N.Y.C. Admin. Code §§ 8-901 – 8-907, creates a private right of action for any person subjected to an act of violence or intimidation motivated, at least in part, by gender.

380.    Defendant Gowl's conduct constitutes gender-motivated violence within the meaning of the GMVA. Gowl's repeated sexual assaults—including drugging, choking, and raping Plaintiff in New York—and his subsequent harassment, intimidation, and threats of death were acts of violence committed because of Plaintiff's gender and motivated by his desire to dominate and control her as a woman.

381.    Gowl's pattern of abuse, coercion, and degradation—telling Plaintiff she was ***"quieter and sweeter when half-conscious,"*** instructing her to ***"just lay there like you're asleep and put the vibrator in,"*** and demanding that she ***"get close"*** to him to succeed—reflects a sustained animus and contempt for women, rooted in power and gender dominance.

382.    The assaults and threats were intentional, malicious, and gender-based, and caused Plaintiff to suffer severe physical, psychological, and emotional injuries, including Chronic Post-Traumatic Stress Disorder, Severe Major Depressive Disorder, insomnia, weight gain, and hair loss.

383. Under the GMVA, each such act of gender-motivated violence gives rise to civil liability and entitles Plaintiff to recover damages, including compensatory and punitive damages, as well as costs and reasonable attorneys' fees.

384. Because Gowl's conduct was willful, wanton, and carried out with reckless disregard for Plaintiff's rights and safety, Plaintiff seeks punitive damages to punish and deter similar gender-based violence in the future.

## SIXTEENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Unpaid Overtime under the FLSA)*

385. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

386. 29 U.S.C. § 207(a) requires employers to compensate their employees at a rate not less than one and one-half times their regular rate of pay, or one and one-half the minimum wage rate, if greater, for all hours worked exceeding forty in a workweek.

387. As described above, Defendants are "employers" within the meaning of the FLSA, while Plaintiff is an "employee" within the meaning of the FLSA.

388. As described above, Plaintiff worked in excess of forty hours per week, yet Defendants willfully failed to compensate Plaintiff in accordance with the FLSA's overtime provisions.

389. Plaintiff is entitled to overtime pay for all hours worked per week in excess of forty at the rate of one and one-half times her respective regular rate of pay, or one and one-half times the minimum wage rate, if greater.

390. Plaintiff is entitled to liquidated damages, interest, attorneys' fees, and costs for Defendants' violations of the FLSA's overtime provisions.

**SEVENTEENTH CLAIM FOR RELIEF AGAINST DEFENDANTS**
*(Violations of the Anti-Retaliation Provisions under the FLSA, 29 U.S.C. § 215(a)(3))*

391.    Plaintiff, repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

392.    The Fair Labor Standards Act § 215(a)(3) makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed/made any complaint related to" FLSA's provisions.

393.    As set forth above, Defendants retaliated against Plaintiff for engaging in protected activity. Specifically, Defendants terminated Plaintiff's employment shortly after she\ complained about not being paid the statutorily required overtime rate for all overtime hours worked in a workweek and their behavior.

394.    As a direct and proximate result of Defendants' conduct in violation of the FLSA, Plaintiff has suffered, and continues to suffer damages including, but not limited to, lost past and future income, compensation, and benefits.

**EIGHTEENTH CLAIM FOR RELIEF AGAINST DEFENDANTS**
*(Violations of the Anti-Retaliation Provisions under NYLL § 740)*

395.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

396.    New York Labor Law § 740, as amended effective January 26, 2022, prohibits an employer from taking any "retaliatory action" against an employee-whether or not the employee's reports were within the scope of her job duties-because the employee (a) discloses or threatens to disclose to a supervisor or to a public body an employer activity, policy, or practice that the employee reasonably believes violates any law, rule, or regulation, or reasonably believes poses a substantial and specific danger to the public health or safety; (b) provides information to, or

testifies before, a public body conducting an investigation into such activity, policy, or practice; or (c) objects to, or refuses to participate in, such activity, policy, or practice. The statute defines "law, rule or regulation" broadly to include federal, state, and local statutes and ordinances, executive orders, and judicial or administrative decisions, rulings, or orders, and defines **"retaliatory action"** to include adverse actions or threats affecting current or future employment, including discharge, suspension, demotion, or similar discrimination.

397.     As set forth above, Plaintiff engaged in protected activity under § 740(2)(a)-(c) by disclosing to supervisors and objecting to employer activities, policies, and practices that she reasonably believed violated law, rule, or regulation, specifically Gowl's practice of hiring undocumented workers and engaging in tax fraud.

398.     Thereafter, and prior to and culminating in her termination, Defendants engaged in a pattern of retaliatory action within the meaning of § 740(1)(e), including stripping her of meaningful duties, subjecting her to a hostile work environment, and ultimately terminating her employment.

399.     Defendants' retaliatory actions against Plaintiff violated NYLL § 740.

400.     As a direct and proximate result of Defendants' conduct in violation of NYLL § 740, Plaintiff has suffered, and continues to suffer, damages including, but not limited to, lost past and future income, compensation, and benefits.

## NINETEENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Tortious Interference with Contract)*

397.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "396" as if the same were more fully set forth at length herein.

398.    Following Defendants' retaliatory termination of Plaintiff, seeking to build on her M&A experience, Plaintiff secured a job offer from a private equity firm, contingent upon the completion of a background check.

399.    Defendants, who were listed as Plaintiff's previous employer, became aware that Plaintiff was in the final stage of securing a new job at this private equity firm.

400.    Upon learning of this new job offer, Defendants intentionally and maliciously provided false, misleading, dishonest and damaging information about Plaintiff to her new prospective employer.

401.    Defendants made these false and misleading statements for the sole, express and malicious purpose of inducing this prospective employer to rescind Plaintiff's job offer, which they in fact did.

402.    There was no lawful excuse or justification for the actions taken by Defendants.

403.    As a direct result of the false, misleading and damaging statements made by Defendants, the prospective employer rescinded Plaintiff's job offer, stating they ***"had received new information"*** and no longer wanted to move forward.

404.    The loss of these contracts had a devastating financial impact and emotional impact on Plaintiff, resulting in significant economic losses as well as having a devastating impact to her career advancement in the M&A industry.

### **TWENTIETH CLAIM FOR RELIEF AGAINST DEFENDANTS**
*(Tortious Interference with Economic Advantage Under New York State Law)*

405.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "404" as if the same were more fully set forth at length herein.

406.    Following Defendants' retaliatory termination of Plaintiff, seeking to build on her M&A experience, Plaintiff secured a job offer at a private equity firm contingent upon the completion of a background check.

407.    Defendants who were listed as Plaintiff's previous employer became aware that Plaintiff was in the final stage of securing a new job at this private equity firm.

408.    After learning of Plaintiff's pending job offer with the private equity firm, Defendants communicated with the private equity firm directly or indirectly through Plaintiff's recruiter.

409.    During Defendants' communications with this private equity firm made directly or indirectly through Plaintiff's recruiter, Defendants intentionally and maliciously provided false, misleading, dishonest, and damaging information about Plaintiff to her new prospective employer.

410.    Defendants made these false and misleading statements for the sole, express and malicious purpose of inducing this prospective employer to rescind Plaintiffs job offer, which they in fact did.

411.    Defendants made these statements with the intention of inflicting severe harm on Plaintiff.

412.    There was no lawful excuse or justification for the actions taken by Defendants.

413.    As a result of Defendants' unlawful actions, Plaintiff has suffered substantial economic losses and permanent damage to her reputation.

## TWENTY FIRST CLAIM AGAINST DEFENDANTS
*(Intentional Infliction of Emotional Distress)*

414.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "413" as if the same were more fully set forth at length herein.

415.    Defendants Gowl and Wade, by their actions described above, exhibited a pattern of extreme and outrageous conduct towards Plaintiff, both during and after Plaintiff's employment, that exceeded all bounds of decency.

416.    In undertaking the aforementioned actions, Defendants Gowl and Wade intended to cause Plaintiff severe emotional distress and did in fact do so, requiring her to seek treatment from a professional therapist and a psychiatrist as a result.

417.    Defendants PAX, New State, and Coastal Pools as well as other named corporate co-Defendants, are vicariously liable for the unlawful conduct of their agents, Defendants Gowl and Wade.

418.    As a proximate cause of Defendants' unlawful acts, Plaintiff has suffered, and will in the future continue to suffer, substantial damages, including but not limited to, severe emotional distress and suffering, and all damages set forth above and incorporated herein, for which she is entitled to an award of damages.

## DEMAND FOR A JURY TRIAL

418.    Pursuant to FRCP 38(b), Plaintiff demands a trial by jury in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a.    A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned United States and New York State laws;

b.    Preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

c.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

d.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

e.      All damages that Plaintiff has sustained as a result of the Defendants' conduct, including all unpaid wages and any shortfall between wages paid and those due under the law that Plaintiff would have received but for Defendants' unlawful payment practices;

f.      Liquidated damages and any other statutory penalties as recoverable under the FLSA;

g.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

h.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

i.      An award of punitive damages;

j.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

k.      Such other and further relief as the Court may deem just and proper.


Dated:  New York, New York
        November 25, 2025


                                        Respectfully submitted,

                                        **JOSEPH & NORINSBERG, LLC**


                        By:     _____
                                BENNITTA L. JOSEPH, ESQ.
                                825 Third Avenue, Suite 2100
                                New York, New York 10022
                                Tel.: (212) 227-5700
                                Fax: (212) 656-1889
                                *Attorneys for Plaintiff*